**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 14, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROY C. JOHNSON; MARK A.
MOORE; DWIGHT E. JACKSON;
STEVEN L. GIBBS; DEBORAH J.
DANIELS-FLEAK; DEBBIE R.
CRISP; DEBRA D. DICKENS;
TAMMARA MCKINNEY-OLDEN;
RUFUS E. NEWSOME; TYRONE D.
LYNN; MARVIN BLADES;
WALTER E. BUSBY, JR.; DERREK
L. LEWIS; RAY D. NELSON;
CORNELIUS D. FINLEY; GARY L.
PITTS; ALBERT L. YOUNG,

      Plaintiffs - Appellants,

   v.

CITY OF TULSA, OKLAHOMA;
LODGE 93 FRATERNAL ORDER OF
POLICE, LODGE #93,

      Defendants - Appellees.

No. 05-5064

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 94-CV-39-TCK-FHM)**

---

Louis W. Bullock (Robert M. Blakemore with him on the brief), of Miller, Keffer
& Bullock, P.C., Tulsa, Oklahoma, for Plaintiffs - Appellants.

Joel L. Wohlgemuth (David R. Ross with him on the brief), of Norman
Wohlgemuth Chandler & Dowdell, Tulsa, Oklahoma, (Larry V. Simmons, Tulsa
City Attorney's Office, Tulsa, Oklahoma, with him on the brief), for Defendants -

Appellees.

Before **HARTZ**, **EBEL**, and **O'BRIEN**, Circuit Judges.

**HARTZ**, Circuit Judge.

The question presented on appeal is whether a prevailing party in a class-action civil-rights lawsuit is entitled to attorney fees for post-consent-decree efforts that resulted in no court order or judgment. The district court held that such a party is not. We hold that attorney fees may be awarded for efforts to preserve the fruits of the decree. When, as in this case, the consent decree establishes mechanisms for ensuring proper treatment of class members, attorney fees are compensable for reasonable efforts to ensure that those mechanisms are properly functioning. We therefore reverse and remand for further proceedings.

**I.     BACKGROUND**

In 1994 Roy Johnson, a Tulsa police officer, filed a complaint against the City of Tulsa (City) alleging that it had discriminated on the basis of race in employment practices. In 1998 the district court certified the case as a class action with a number of named plaintiffs. The class, consisting of all current and future African-American officers of the Tulsa Police Department (TPD), asserted that the City had engaged in various civil-rights violations under 42 U.S.C. §§ 1981, 1983, and Title VII, 42 U.S.C. § 2000e et seq. The Fraternal Order of

Police (FOP) was granted leave to intervene as a defendant.

After extensive litigation the parties entered into a consent decree (the Decree) that was approved by the court on May 12, 2003. The Decree is a lengthy document with a number of provisions.

## A.     The Decree

### 1.     Community Relations

Some provisions of the Decree appear designed more to help the community than the members of the plaintiff class. Section 2 of the Decree requires the City to apply for accreditation by the Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA), whose purpose is "to develop a set of law enforcement standards; and to establish and administer an accreditation process through which law enforcement agencies could demonstrate voluntarily that they meet professionally-recognized criteria for excellence in management and service delivery." R. Vol. III at 328. The City must continue to meet CALEA standards and reapply for accreditation every three years.

Likewise, § 12 requires the City to review its training curriculum to ensure that the "training supports the objectives of the Court's Decree to unify the Department and the Community, " i*d.* at 337–38, and to prepare a report of its findings and "the steps taken to implement them, " *id*. at 338. Section 16 prohibits racial bias in policing and requires the City to adopt and implement

policies promoting cooperation between police officers and citizens. And § 17

requires the City to implement policies to create a partnership between the TPD

and members of the community.

## 2. Antidiscrimination Provisions

Other Decree provisions forbid discrimination in hiring, promotion, and

police operations, and require specific procedures to give officers a fair

opportunity for advancement. Section 5[1] sets out the process for making

---

[1]The full text of the relevant provisions of § 5 is:

5.1   For the purposes of this Consent Decree, specialty assignments shall be defined as all assignments other than those that are bid under the current bid process, and the position of FOP president. All specialty assignments shall be made on the basis of merit and fitness.

5.2   The Department has adopted a process for making specialty assignments which provides for the posting in each division and upon the City's intranet all openings in specialty assignments. These postings are to include but are not limited to the specific assignment, the job description, minimum qualifications of that assignment and preferred qualifications. This process shall continue.

5.4.  In each division, the Major shall be charged with accepting all applications for specialty assignments and for making recommendations to the Deputy Chief. The Deputy Chief shall forward the Major's recommendation to the Chief, with the Deputy Chief's own recommendation to approve or reject the Major's recommendation. All applicants shall be notified of the final decision.

5.5   A policy shall be adopted and implemented prohibiting those in the chain of command of positions being filled from directly or indirectly recruiting persons to apply for a specialty assignment other than through the announcement provided in Paragraph 5.2. Should no one who is qualified apply for an assignment during the period open for

specialty assignments (assignments that are not bid under the regular bid process) within the TPD.  Subsection 5.1 requires that "[a]ll specialty assignments . . . be made on the basis of merit and fitness," and § 5.2 requires that the TPD post specialty-assignment vacancies and that the posting include information about the position such as the "assignment, the job description, minimum qualifications of that assignment and preferred qualifications."  *Id.* at 331–32.  Subsection 5.4 specifies that the Major shall accept applications and make a recommendation for each position to the Deputy Chief, who will then forward that recommendation and his or her own recommendation to the Chief of Police for a final decision. All applicants must be notified of the final decision.  Subsection 5.5 requires the TPD to adopt and implement a policy "prohibiting those in the chain of command of positions being filled from directly or indirectly recruiting persons to apply for

submitting applications, a period which shall be no less than three weeks, the chain of command or others may then take steps to secure qualified persons to serve in the open position, including actively recruiting qualified persons within the Department.

5.6    The established minimal requirements for all positions shall be reviewed by the Department to assure that those requirements directly relate to the requirements of the position.

5.7    With the following exception, the established minimum qualifications for positions shall not be waived.  If no one who meets the minimum qualifications for an open specialty assignment applies for that assignment, the Department may open the position to all applicants and select the most qualified applicant for the position.

R. Vol. III at 331–33.

a specialty assignment other than through" the new announcement procedure, unless no qualified person applies for the position during the three weeks following the posting. *Id*. at 332. Subsection 5.6 states that the minimum requirements for each specialty assignment must directly relate to the requirements of the position, and § 5.7 provides that the TPD may not open the position to all applicants unless no one meets those minimum qualifications.

Section 6, which addresses recruiting, provides that "all hiring shall be based on merit and fitness." *Id*. at 334. The TPD must establish a recruiting task force to evaluate and develop strategies for recruiting, including the recruitment of women and minorities. To "attract and retain applicants," *id*., the TPD must offer temporary employment opportunities to those accepted to the police academy. Section 7 states that promotions must be based on merit and fitness. Section 9 requires the City to ensure "that all supervisors enjoy all of the rights and privileges which normally accompany" their rank, *id*. at 336. (This provision is apparently a response to allegations that African-American supervisors did not receive proper deference from subordinates). Section 13[2] requires the City to

---

[2]The full text of the relevant parts of § 13 is:
13.1   The City shall adopt and implement a policy consistent with First Amendment law which forbids all forms of retaliation directed at any officer or civilian raising matters of public concern, including but not limited to, claims of racial, gender, religious, or national origin discrimination or other rights conferred by the Constitution and laws of the United States, the Constitution and laws of the State of

"adopt and implement a policy" forbidding retaliation "directed at any officer or civilian raising matters of public concern, including but not limited to, claims of racial, gender, religious, or national origin discrimination." *Id.* at 339. And § 14 requires the City to adopt a policy describing the obligation of officers to provide back-up support for other officers and to investigate complaints of backing failures.

### 3. Data-Collection Provisions

Two Decree provisions relate to data necessary to monitor compliance with the Decree's requirements. Section 3 requires the TPD to maintain a data-collection system that tracks information on each officer, including race, gender, assignments, training, performance ratings, complaints, discipline, traffic

---

Oklahoma, or this Decree. The right to be free from retaliation shall include those who assert such matters on behalf of others. It shall not include protection for those who raise issues of personal interest. The policy shall further forbid any form of retaliation against any officer or civilian who participates in any fashion in assisting a person bringing a complaint alleging that their rights have been violated.

13.3 This policy shall define retaliation as being an action motivated by a desire to punish a person for the exercise of First Amendment rights which alters the terms and conditions of employment, including but not limited to, giving unfair evaluations; initiating a disciplinary action; giving excessive punishment for a disciplinary infraction; failing to back or assist another officer; or giving unfavorable assignments.

R. Vol. III at 339–40.

citations, arrests, and civil complaints. Section 27 adds to these obligations the requirement that the City maintain the "records necessary to document its compliance with the terms of th[e] Decree." *Id*. at 351. Subsection 27.3 grants access by the Independent Auditor (a monitoring position created by the Decree, to be discussed later) to a wide variety of TPD data and reports. Under § 27.4 "Counsel for Plaintiffs shall be provided access to the[se] documents and data . . . upon reasonable request to the City." *Id*. at 353. Subsections 27.4 and 27.5 state that Plaintiffs may also request other open records relevant to compliance and "shall have the right to share with Plaintiffs' Counsel information relevant to compliance with this Decree available to them over the Department's intranet." *Id*. In addition, under § 27.8 "[t]he City shall provide Plaintiffs' counsel quarterly access to the Chief of Police." *Id*. at 354.

### 4. Compliance Mechanisms

The Decree also establishes mechanisms for overseeing compliance with antidiscrimination and other requirements. Section 11,[3] which addresses

---

[3]The full text of the relevant parts of § 11 is:

11.1 The City shall reorganize Internal Affairs into two squads. The current internal affairs function shall be assigned to a new Investigations Squad charged with conducting investigations of complaints. A second squad, the Audit and Inspections Squad, shall be charged with assuring that the Department is operating consistent with the Department's policies. It shall conduct such investigations and audits of the Department's data as necessary to meet this charge. The Audit and Investigations Squad shall be staffed by two sergeants,

-8-

discipline within the TPD, reorganizes the Internal Affairs Section into two squads: the Investigations Squad, charged with investigating complaints, and the Audit and Inspections Squad, which must ensure that the TPD is "operating consistent[ly] with the Department's policies" by "conduct[ing] such investigations and audits of the Department's data as necessary." *Id*. at 336–37. Subsection 11.3 requires the City to "adopt and implement policies and procedures" to ensure that every stage of the disciplinary process, from the initiation of an investigation to the punishment given to an officer, is "free from racial and or gender discrimination." *Id*. at 337.

Section 21 creates a nine-member committee of the United States District Court for the Northern District of Oklahoma named the Dispute Avoidance and

---

which shall be newly created positions.

11.3   The City shall adopt and implement policies and procedures to assure that all stages of the disciplinary process are free from racial and or gender discrimination, including:
   a.   the initiation of a disciplinary investigation;
   b.   the decision to bring disciplinary charges;
   c.   the resolution of a disciplinary action; and
   d.   the punishment given to an officer found to have violated a Department regulation/policy.

11.5   The initiation of a disciplinary action, a decision to bring disciplinary charges, or any other decision to discipline an employee of the Department is not sufficient, by itself, to evidence discrimination (including but not limited to racial or gender discrimination), without the presence of other indicia of such discrimination.
R. Vol. III at 336–37.

Resolution Committee (Dispute Resolution Committee).  The members are to be three citizens proposed by the parties and selected by the district court, two members selected by the Plaintiffs, two senior members of the TPD selected by the City, and two selected by the FOP.  Section 22 describes the Committee's "primary objective" as "to collect and review information regarding compliance from the Independent Auditor [created in § 26] and the City and then provide the Parties an opportunity to discuss issues concerning the requirements of this Decree, assist in the resolution of issues relevant to this Decree, and assist the Parties in avoiding future litigation over these matters."[4]  *Id.* at 346.  Section 23

_____

[4]The full text of § 22 reads:

22.1    The primary objective of the Committee shall be to collect and review information regarding compliance from the Independent Auditor and the City and then provide the Parties an opportunity to discuss issues concerning the requirements of this Decree, assist in resolution of issues relevant to this Decree, and assist the Parties in avoiding future litigation over these matters.  The Committee shall have only the duties, responsibilities, and authority conferred by this Decree.  The Committee is not authorized to make policy and shall not issue orders or directions to any Party or any agent, representative or employee of the City.  This Committee shall assist the Parties in making the changes and resolving issues related to the policies and practices required by this Decree.  When called upon to do so, the Committee shall address disputes over compliance acting as an alternative dispute resolution tool pursuant to the local rules of the United States District Court for the Northern District of Oklahoma.  Committee members shall be required to participate in proceedings of the Committee in good faith, openly discussing issues and seeking ways in which any differences can be resolved.  All processes of the Committee shall be non-binding and not based upon voting majorities.

gives the Committee the authority to act as an adjunct settlement judge under Local Rule 16.2 of the United States District Court for the Northern District of Oklahoma in any settlement conference between the parties. If the Plaintiffs believe that the City has failed to fulfill any of its obligations under the Decree, § 25.2 requires that they give written notice of the alleged failure to the City and the Committee 45 days before initiating any court proceeding.

Section 26[5] creates an Independent Auditor, appointed by the court and paid

R. Vol. III at 346–47.

[5]The relevant parts of § 26 are:
26. INDEPENDENT AUDITOR

26.1 Within thirty (30) days of the entry of this Decree, the City and the Plaintiffs' class shall select an Independent Auditor for appointment by the Court, with any disputes as to selection to be referred to Settlement Judge Eagan for attempted resolution. The City shall bear the cost of the Independent Auditor which shall not exceed $36,000 per annum, which may be increased only by a showing to the Court of clear and convincing evidence that failure to increase the per annum cost would impede the achievement of the objectives of this Decree and would not violate the Oklahoma Municipal Budget Act. . . .

26.2 The Independent Auditor shall have senior management experience and such other experience as the Court finds appropriate, but may not be a present or former employee or family member of the City.

26.3 Once appointed, the Independent Auditor shall be deemed an officer of the Court. The Independent Auditor is not a state or local agency, or an agent thereof. The Independent Auditor shall not accept employment or provide consulting services that would present a conflict of interest with the Independent Auditor's responsibilities under this Decree, including being retained (on a paid or unpaid

basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the City or the FOP, or their officers, agents or employees, or on behalf of the City or the FOP, or their officers, agents or employees.

26.4 The Independent Auditor shall not issue statements or make findings with regard to any act or omission of the City or its agents, representatives or employees except as required by the terms of this Decree, during a proceeding in this case or as might otherwise be required by the Court. The Independent Auditor may testify in an action brought by one of the Parties to enforce this Decree regarding any matter relating to the implementation, enforcement or dissolution of the Decree. The Independent Auditor shall not testify in any other litigation or proceeding with regard to any act or omission of the City or any of its agents, representatives or employees related to this Decree or regarding any matter or subject that the Independent Auditor may have received knowledge of as a result of his or her role under this Decree.

26.5 The Independent Auditor shall perform a review of the City's compliance with the terms of this Decree and shall report to the Committee three (3) times a year as to the City's compliance. The City shall provide the Independent Auditor with access to the data collected pursuant to the provisions of Paragraph 3 of this Decree, and any existing completed analysis thereof. In addition, the Independent Auditor shall have access to City staff responsible for creating or compiling this data. . . . The Independent Auditor shall have access . . . to the reason for rejection of applicants to the Academy in order to determine compliance with this Decree. Notwithstanding any other provision of this Decree, counsel for Plaintiffs shall not have access to such reason. Any dispute over requests for additional information shall be referred to the Committee for resolution. If the Committee is unable to resolve any such dispute, the Independent Auditor may request the Court grant appropriate access to the requested documents, data, or staff.

26.6 The Independent Auditor's role is limited to compliance with this Decree; the Independent Auditor is not a substitute for Internal

by the City (no more than $36,000 per year, unless essential to effectuate the Decree), who "shall perform a review of the City's compliance with the terms of th[e] Decree and shall report to the Committee three (3) times a year as to the City's compliance." *Id.* at 350. The City is to provide the Independent Auditor with necessary access to persons and information. "The Independent Auditor's role is limited to compliance with th[e] Decree; the Independent Auditor is not a substitute for Internal Affairs or criminal investigations." *Id.*

### 5. Pre-Decree Discrimination

Sections 28 to 31 of the Decree address individual grievances arising from pre-Decree discrimination. Those with claims of race discrimination, retaliation, wrongful discharge, or harassment in employment that arose before August 1, 2001, could file in district court a sworn statement of their claim within 60 days of entry of the Decree (which was on May 12, 2003). Those found to have been wrongfully denied a promotion could recover all available Title VII relief, front pay, and back pay (up to $200,000), but no punitive damages. Those who established wrongful termination before August 1, 2001, could receive back and front pay up to $150,000 and all other available Title VII relief. For other claims

---

Affairs or criminal investigations.
R. Vol. III at 348–50.

-13-

that accrued before August 1, 2001, claimants could recover compensatory damages (including lost wages up to $10,000). With respect to all claims, successful individual claimants could recover attorney fees and expenses up to $3,000 and a one-time additional $10,000 in attorney fees and expenses for litigating the statute of limitations, discrimination in the promotion process, or discrimination and retaliation in discipline.

### 6. Miscellaneous

Under the Decree, the district court retains jurisdiction of the action. Section 32 provides that after five years the City may move for dissolution of the Decree upon a showing that it has been in substantial compliance for two years. Should the City move for dissolution, the Plaintiffs may object and present evidence at a court hearing. Both Parties agreed to defend the Decree against third-party attacks. Finally, the Decree states that Plaintiffs intended to move for attorney fees.

Many of the Decree's provisions were explained in a Notice of Proposed Settlement of Class Action, Fairness Hearing and Right to Object that the parties submitted to the court in December 2002. The purpose of the Notice was to inform class members of the provisions of the proposed Decree, and it contained much of the language included in the final Decree. At least one provision in the Notice differed from the Decree. Under the heading "Monitoring by Plaintiffs,"

the Notice stated, "The Decree provides opportunities for Plaintiffs to monitor compliance by requiring the City to provide their counsel with a number of documents, reports, and data." R. Vol. II at 175. Although the final Decree does give Plaintiffs' counsel access to certain documents, it contains no use of the word *monitor*.

## B.    Post-Decree Efforts

Plaintiffs seek reimbursement for their attorneys' post-Decree efforts. It is therefore essential to describe those efforts as best we can on the record before us.

### 1.    Letters to the City

The record indicates that Plaintiffs' counsel wrote a number of letters expressing concerns about possible violations of the Decree. For example, apparently between September 25, 2003, and March 24, 2004, they sent seven letters to the City alleging violations of the "assignments provisions of the Consent Decree, with regard to [Debra] Dickens and [Ron] Clark." Pl.'s Reply to Resp. of City of Tulsa to Notice of Noncompliance at 2, *Johnson v. City of Tulsa*, No. 94-C-39-H (M) (N.D. Okla. May 28, 2004). The record, however, does not contain these letters, so we must infer their content (and hence the efforts by Plaintiffs' counsel) by descriptions of them in other documents discussed below.

### 2.    Letter to the Independent Auditor

On October 29, 2003, Plaintiffs' counsel sent the Independent Auditor a letter alleging that the City had violated certain provisions of the Decree. Although the letter is not in the record, its contents are referenced in the Auditor's responses in his First Report to the Dispute Resolution Committee, dated December 16, 2003, and his Second Report, dated April 21, 2004. We summarize each allegation in the letter, as described by the Auditor, and his response:

(1) Counsel alleged that the City had violated § 5 of the Decree (relating to specialty assignments) with respect to two officers, Debra Dickens (a named Plaintiff) and Ron Clark. The First Report does not specify the claimed violations and responds only by stating that the Plaintiffs' concerns and allegations would be more appropriately addressed to the Internal Affairs Section and the Dispute Resolution Committee. The Auditor added that he would consider any reports issued by these two entities in his next status report. After reviewing additional information submitted by the Plaintiffs and the City, he concluded in his Second Report that the City was in compliance with regard to Officer Dickens but had violated § 5.2 with regard to Corporal Clark. The Auditor did not specify how the City had failed to comply with § 5.2, but noted that "when both the Dickens and Clark matters occurred, the Decree was less than a month old and the City had not yet incorporated the required protections mandated by the Decree." Indep.

Auditor's Second Report to the Dispute Avoidance & Resolution Comm. (Second Report) at 3–4, *id*. (Apr. 21, 2004).

(2) Counsel alleged that the City had violated § 5.6 requirements regarding vacancy announcements for specialty assignments. The First Report responded that the City was in compliance because it was in the process of conducting the required review of such announcements. After receiving additional information from the City, the Auditor concluded in his Second Report that the City was in compliance with § 5.6.

(3) Counsel alleged that the City had not fully complied with the § 6 mandate to establish a recruiting task force. The First Report found the City in compliance, noting that Plaintiffs' concerns regarding composition of the task force were more properly addressed to the Dispute Resolution Committee. In the Auditor's Second Report he again found the City in compliance.

(4) Counsel alleged that the City had failed to offer temporary assignments to those accepted to the Tulsa Police Academy, in violation of § 6. Because no temporary-assignment positions had yet become available, the First Report stated that the Independent Auditor was unable to determine whether the City had complied with this provision. When he submitted his Second Report, no temporary positions had yet been identified, so he still was unable to determine compliance.

(5) Counsel alleged that the City had failed to enforce § 9 because "'insubordination towards black supervisors has been, and continues to be, a serious problem in the Department'" and the department had failed to take corrective action. Indep. Auditor's First Report to the Dispute Avoidance & Resolution Comm. (First Report) at 7 n.9, *id*. (Dec. 16, 2003) (quoting one of Plaintiffs' letters to the Indep. Auditor (which are not in the record)). The First Report responded that these concerns should be addressed to the Internal Affairs Section and the Dispute Resolution Committee, and that the Auditor would consider any report issued by either entity in his next status report. The Second Report stated only that § 9 "requires no determination from the Independent Auditor." Second Report at 6.

(6) Counsel alleged that the City had failed to recognize publicly the Black Officer's Coalition, in violation of § 10. The First Report stated that although public recognition would be good, it was not required under the terms of the Decree. The Second Report stated that this section required no determination from the Independent Auditor.

(7) Counsel alleged that the City had violated the § 11.3 requirement that the disciplinary process be free from discrimination. The First Report responded that this concern should initially be addressed to the Internal Affairs Section and the Dispute Resolution Committee. The Second Report stated that after reviewing

the information submitted by the City in its first Progress Report and Supplement, the Independent Auditor had determined that the City had complied with § 11.3 by providing a draft disciplinary policy to the Dispute Resolution Committee for its review.

(8) Counsel alleged that the City had failed to submit a report required under § 12 detailing its findings on how current officer training supported the Decree's objective of unifying the TPD and the community. The First Report agreed that the City had failed to submit the report. The Second Report found the City in compliance because it had "begun a review of Academy training and in-service curriculum," Second Report at 7, though it did not mention whether the required report had been provided.

(9) Counsel alleged that the City had failed to comply with § 17 regarding partnership in policing. Both the First and Second Reports found that the City had complied with this section because it had adopted and begun implementing CALEA standards.

### 3. Notice of Noncompliance

After the Independent Auditor's Second Report on April 21, 2004, Plaintiffs' counsel filed in district court on May 10, 2004, a Notice of Noncompliance. The Notice reasserted a number of allegations in the October 29, 2003, letter to the Auditor, because counsel believed that the Auditor had ignored

-19-

evidence of violations when he found the City in substantial compliance with the Decree in his First and Second Reports. The following summarizes the specifications of noncompliance:

The Notice alleged several violations with respect to Corporal Ron Clark. The Second Report had found the City in violation of § 5.2 (without specifying the nature of the violation), although it commented that the violation had occurred less than a month after the effective date of the Decree. The Notice alleged that the City also (1) had violated § 5.1, which requires that all specialty assignments be made on the basis of merit and fitness, because it had awarded the Motorcycle Squad Corporal position to an officer who was less experienced than Corporal Clark, was in worse physical condition, and had performed worse on the motorcycle-riding exam; and (2) had violated § 5.4, which requires that the assignment decision be made by the Major, because the less-qualified officer had been selected by the Motorcycle Squad Sergeant and was "based in part upon an informal survey of the entire Motorcycle Squad." R. Vol. IV at 439. The Notice did not state whether Corporal Clark had filed a grievance with the Internal Affairs Section or whether the matter had been presented to the Dispute Resolution Committee.

The Notice alleged similar violations with respect to Officer Dickens, a named Plaintiff. It alleged that she had been denied two specialty assignments,

one as Detective Division Investigator and one as Traffic Safety Coordinator, despite being more qualified than the white officers who received the assignments. The Notice asserted that Officer Dickens was qualified for the Detective Investigator position because of her 16 years' experience as a police officer and her prior experience as a Hit & Run and Fatality Investigator. It claimed that the City had justified its hiring of two white officers for the Detective Division positions after the fact by noting that one was good at serving warrants and was a former auto mechanic and that the other had prior knowledge of street crimes. According to the Notice of Noncompliance, because these qualifications were not listed in the posted job notices, the City had violated § 5.2, and because the appointments were not based on merit and fitness, the City had violated § 5.1. The Notice also alleged that despite having substantial experience directly relevant to the position, Officer Dickens had been passed over for a Traffic Safety Coordinator position that was instead given to an officer who had not even applied for the job, in violation of § 5.5. The Notice contained no information about whether Officer Dickens had brought her concerns to the Internal Affairs Section or the Dispute Resolution Committee.

Another alleged violation relating to Officer Dickens was the failure to provide her with requested back-up support on several occasions, in violation of § 14, which requires that officers back other officers in need. Moreover, the

Internal Affairs Section had allegedly responded to the reported incidents by investigating Captain Busby, also a named Plaintiff, rather than the radio dispatcher, an incident of retaliation in violation of § 13.

The Notice further complained that the TPD's April 2004 decision to transfer officers from the Detective Division back into the field had violated § 5.1 of the Decree, which requires that assignments be made on the basis of merit and fitness. Sixteen officers, four of whom were black, had been transferred out of the Division. Of the four black officers, three were named Plaintiffs in the class-action suit. The City had given three different reasons why those particular officers had been transferred, none of which related to merit and fitness. The Notice also suggested that the transfers of these three officers were in retaliation for their role in the class action, in violation of § 13. Again, the Notice failed to state whether any of these concerns had been addressed to either the Internal Affairs Section or the Dispute Resolution Committee.

Officer Matt Wicks was also alleged to have suffered retaliation in violation of § 13. Officer Wicks had filed in district court, under the Decree provisions that authorized filing individual claims, a statement of claim alleging that in 1998 he had been denied a specialty assignment in the Mounted Patrol Unit because of his involvement in the TBOC. The Notice alleged that in retaliation for this claim, the City had begun a disciplinary investigation of Wicks, charging

-22-

that his claims made false allegations against a fellow officer. When Wicks requested that the disciplinary investigation be halted, Police Chief Been declined, saying that the Decree required that he complete the investigation.

The final violation alleged by the Notice was the appointment of Bob Jackson, a former president of the FOP, to the Gang Unit. According to the Notice, not only was the position not posted, a violation of § 5.2, but the assignment was not made on the basis of merit and fitness as required by § 5.1, and he was recruited directly for the position, a violation of § 5.5.

In a May 18, 2004, response to the Notice of Noncompliance, the City pointed out that the Decree required Plaintiffs to submit any disputes to the Dispute Resolution Committee before initiating a court proceeding. Plaintiffs replied that they had provided the City with repeated notice of the alleged violations, including seven letters between September 25, 2003, and March 24, 2004, regarding Dickens and Clark, and that the City had merely denied that any violations had occurred. Moreover, they said, because the Auditor had found the City in compliance with the Decree, they felt that they had to respond to that finding in some way.

Plaintiffs took an additional step with respect to one alleged violation of the Decree. On June 8, 2004, they filed a motion for a preliminary injunction to halt retaliatory conduct against Officer Wicks. On June 21 the district court

referred this dispute to another judge for a settlement conference on June 23. On June 25 the court granted a motion to withdraw Plaintiffs' motion for injunctive relief, although the record does not indicate the terms of settlement.

The Notice of Noncompliance was referred to the Dispute Resolution Committee by the district court on June 21, 2004. Before the Committee acted, the Independent Auditor filed his Third Report on July 1, 2004. It recited the City's assertions that (1) the transfers out of the Detective Division had not been retaliatory, had been necessary because more officers were needed in the field, had been made under the FOP's Collective Bargaining Agreement with the TPD, and had not been the subject of a grievance or complaint by any of the transferred officers who were named Plaintiffs; (2) the assignment of Bob Jackson to the Gang Unit "'was not a normal special assignment'" but a response to an "'immediate need' for an officer with a 'day shift weekends off' work schedule," and was a temporary assignment made under the Collective Bargaining Agreement. Indep. Auditor's Third Report to the Dispute Avoidance & Resolution Comm. (Third Report) at 4 n.3, *Johnson v. City of Tulsa*, No. 94-C-39-H (M) (July 1, 2004). The report found that the City had complied with § 5 regarding specialty assignments and § 13's prohibition on retaliation, although its only mention of a retaliation allegation was to note the settlement of the Wicks claim. It further found that the City had complied with § 14, regarding

backing, because the City had ordered a full investigation into Officer Dickens's complaint that she had not received backing. Overall, the Report found no violation of the Decree.

At a meeting on July 30, 2004, the Dispute Resolution Committee decided that the issues identified in the Notice of Noncompliance should be referred to the adjunct settlement process. The district court adopted the recommendation on August 16, 2004, referring the Notice's allegations regarding (1) the failure to select Dickens as an investigator in the Detective Division; (2) the failure to assign Clark to the Motorcycle Squad; (3) the reassignment of three named Plaintiffs from the Detective Division to the field; and (4) the assignment of Jackson to the Gang Unit. Two weeks later it entered an order stating that the parties had settled the claims set forth in the Notice. Under the settlement Officer Dickens was offered a position with the Detective Division's Diversified Crimes Unit and Corporal Clark was assigned to the motorcycle unit. One of the named Plaintiffs previously transferred from the Detective Division was allowed to remain, while the other two named Plaintiffs who had been transferred selected other assignments. Also, the TPD agreed to draft and implement a new policy clarifying criteria for transfers. Plaintiffs voluntarily dismissed their claim with regard to Bob Jackson's assignment to the Gang Unit. In return the City agreed to "draft, enact and implement policy language which clarifies that, in the future,

when a temporary or interim assignment is made to a position which is intended to be a permanent position, the City will announce the permanent assignment as open . . . and proceed to fill the position on the basis of merit and fitness." R. Vol. VII at 929.

### 4.    Captain Poindexter Incident

After the Auditor filed on October 27, 2004, his Fourth Report, in which he found no instances of noncompliance, Plaintiffs' counsel filed another Notice of Noncompliance in district court on November 4.  It addressed only one claim, an alleged retaliatory and discriminatory disciplinary action against Captain Greg Poindexter, in violation of §§ 11.3 and 13 of the Decree.  Captain Poindexter, an African-American, had applied to take a promotional exam to become a major. When he learned that a new component had been added to the exam, an oral resume, he criticized the innovation.  He finished fourth on the exam, complained to one of the examiners about the unfairness of the new exam, and sought advice from the examiner on how he could improve his candidacy.  Police Chief Been learned of the conversation and ordered an investigation into whether Poindexter had violated TPD Rule 8, which provides that "'[o]fficers and employees shall not commit any act or indulge in any behavior, on or off duty, which tends to bring reproach or discredit upon the Department,'" and TPD Rule 10, which states that "officers may not publicly criticize the TPD in a 'defamatory, obscene,' or

'unlawful' manner." *Id.* at 960 (emphasis omitted). As a result of the investigation, Poindexter was suspended for 20 days and demoted three ranks from captain to officer. Plaintiffs' counsel gave the Dispute Resolution Committee written notice of these allegations on August 6, 2004, but the City failed to respond within the 45-day period allowed by the Decree. Counsel then contacted the City on September 22 and 29, 2004, to discuss settlement of these claims. The City responded: "The actions taken against Officer Poindexter were justified, and did not violate the Consent Decree. Nothing in the Consent Decree deprives the City from disciplining members of the Department who have violated Department policies and procedures." *Id.* at 988 (City's Resp. to Pls.' Sept. 22 Letter). It does not appear that Poindexter ever sought an investigation by the Internal Affairs Section.

On January 24, 2005, more than two months after filing the Notice, Plaintiffs' counsel filed a pleading that combined a motion for a temporary restraining order, a motion for a preliminary injunction, and a motion to supplement the notice of noncompliance. On January 14, 2005, Chief Been had notified Poindexter of a pretermination hearing arising from his alleged attempt to obtain improper reimbursement of medical expenses through his Flex Plan account, a violation of TPD Rule 6 requiring officers to be truthful. The pleading contended that (1) the investigation into the reimbursement issue, coming only

seven days after the August 6 letter to the Dispute Resolution Committee alleging retaliation against Poindexter, was further retaliation, and (2) this degree of discipline violated the Decree's prohibition against racially motivated disparate discipline because it was harsher than that faced by white officers who had been accused of dishonest acts. The pleading therefore sought to enjoin the pretermination hearing and any subsequent termination of Officer Poindexter until the district court had ruled on the retaliation violations alleged in the November 4 Notice of Noncompliance. The pleadings relating to Poindexter were eventually dismissed on February 28, 2005, at the request of Plaintiffs' counsel. The record contains no explanation.

### 5. Attorney-Fee Request

Attorney fees in civil-rights litigation may be awarded under 42 U.S.C. § 1988(b), which states that a court "in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." On February 4, 2005, Plaintiffs' counsel filed in district court an amended motion seeking reimbursement under § 1988 for attorney fees and expenses incurred in two activities: (1) pursuit of the original fee request, and (2) post-Decree monitoring and compliance efforts. The district court's award with respect to the first activity is not challenged on appeal.

With respect to the monitoring and enforcement activities, counsel sought

approximately $96,000.  At a March 1, 2005, hearing before the magistrate judge on the fee request, Plaintiffs' lead attorney Louis Bullock testified that his firm had "mostly . . . been responding to specific events which have been raised by officers where we believe there was a clear violation of the Consent Decree" and that it was "clear that the plaintiffs have a role" in monitoring and enforcing the Decree.  Aplee. Supp. App. at 135.  Plaintiffs should get attorney fees, he said, because "[t]he law in this circuit is that plaintiffs counsel in class actions have an obligation to monitor and enforce" consent decrees.  *Id*.  He continued, "[T]here's a clear legal obligation . . . to respond to the claims of individual class members who were treated in violation of the decree."  *Id*. at 135–36.  When asked whether these individual claims related to the original decree, he replied, "You're only there because you won."  *Id*. at 136.  In response to the City's argument that it was inappropriate to seek compensation for raising individual compliance claims, Mr. Bullock testified that "many of the things in the Consent Decree . . . are only demonstrated . . . in the treatment of an individual officer."  *Id*. at 143.  He noted in particular that retaliation and discrimination in specialty assignments were actions directed against individuals.  In his view the existence of the Independent Auditor did not alter this duty, because "even where there is a monitoring or some type of a court process, . . . plaintiffs' counsel will continue to have their independent obligation to enforce the decree."  *Id*. at 145.  On cross-examination

he conceded that he could have negotiated in the Decree a provision for payment of attorney fees incurred in monitoring compliance, and that the Decree lacked such a provision, but he reiterated that even without it Plaintiffs had a monitoring role. He pointed out that there was no reason for Plaintiffs to be given copies of reports and documents if they were not in some way to be involved in monitoring the Decree.

The magistrate judge recommended that the request be denied under the Supreme Court's decision in *Buckhannon Board & Care Home, Inc., v. West Virginia Department of Health & Human Resources*, 532 U.S. 598 (2001). He stated, "[H]owever useful the actions taken by Plaintiffs' counsel in monitoring and seeking compliance with the Consent Decree may have been, since those activities did not produce an order or other decree in Plaintiff's [sic] favor, applying *Buckhannon*, the Court sees those activities as falling outside the terms of [42 U.S.C.] § 1988." R. Vol. VI at 646. Although acknowledging that this result might seem unfair because "the Consent Decree set up a procedure whereby Plaintiffs are required to present disputes concerning compliance to a Committee established by the Decree," the Decree did not "place Plaintiffs in charge of assuring compliance," and "no provision provide[d] for the payment of any fees related to Plaintiffs' monitoring activities." *Id.* at 647. The district court adopted the magistrate judge's recommendation regarding post-Decree monitoring and

Plaintiffs timely appealed.

## II.    DISCUSSION

We review a district court's award of attorney fees for an abuse of discretion, reviewing its findings of fact for clear error and its legal conclusions de novo. *See Browder v. City of Moab*, 427 F.3d 717, 719 (10th Cir. 2005).

Plaintiffs contend that under *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546 (1986), they are entitled to reasonable attorney fees for monitoring the Decree. The City convinced the district court, and argues again on appeal, that the Supreme Court held in *Buckhannon*, 532 U.S. 598, that only work that results in a court order or decree conveys "prevailing party" status for purposes of attorney-fee awards under § 1988, and that because none of the post-Decree work of Plaintiffs' counsel resulted in a court order or decree, it is not compensable. We reach an intermediate position. To explain our conclusion we begin with an analysis of the leading cases relied on by the parties.

Under the traditional "American Rule," the "prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). But 42 U.S.C. § 1988(b) and other fee-shifting statutes override the traditional rule and authorize attorney fees in certain circumstances. Congress enacted § 1988 to "ensure effective access to the judicial process for persons with civil rights

grievances," *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (internal quotation marks omitted), the rationale being that individuals are more likely to seek redress if they have the possibility of recovering their attorney fees. Courts should therefore award fees to the prevailing party under § 1988 "unless special circumstances would render such an award unjust." *Id*.

The question we must resolve on this appeal is the extent, if any, to which prevailing-party status attaches to the postdecree efforts of counsel for a class of plaintiffs who have obtained a consent decree. We begin by discussing precedent from the Supreme Court and our circuit suggesting that postdecree efforts may be compensable even in the absence of affirmative judicial relief.

### A.  *Delaware Valley*

The relevant Supreme Court decision is *Delaware Valley*. The Delaware Valley Citizens' Council for Clean Air (Delaware Valley) had filed suit under the Clean Air Act, 42 U.S.C. § 7410, to compel the Commonwealth of Pennsylvania to enact a vehicle-emissions regulation program. *See* 478 U.S. at 549. The parties entered into a consent decree, under the terms of which Pennsylvania agreed to enact an emissions program for several counties in the Pittsburgh and Philadelphia areas by August 1, 1980. In addition, the Pennsylvania Department of Transportation (PennDOT) would seek legislation to establish private emission-inspection franchises to implement the new emissions requirements. If

the legislature did not approve the franchise system, PennDOT was to promulgate regulations certifying private garages to perform the emissions tests.

The plaintiffs' counsel was quite active after entry of the consent decree and sought attorney fees for those efforts. Although the specific issue before the Supreme Court was whether attorney efforts before administrative agencies could be compensable, the Court's opinion plainly signals approval of compensation for all the described efforts by counsel, so it is instructive to include a rather full description.

The Court divided the activities following entry of the consent decree into nine phases. In Phase I Delaware Valley moved to hold Pennsylvania in contempt because the Pennsylvania legislature had refused to authorize the franchise system and PennDOT had failed to promulgate the required regulations. But before the district court could rule on the motion, PennDOT published the regulations. *See id*. at 549–50. The district court therefore did not hold the Commonwealth in contempt but ordered the parties to establish a revised schedule for implementation of the regulations. Phase II consisted of Delaware Valley's efforts to monitor Pennsylvania's performance and its submission of comments on the proposed regulations. In Phase III Delaware Valley reviewed and approved Pennsylvania's request for a ten-month extension of the August 1, 1980, deadline, which the district court granted. Phase IV concerned further efforts regarding

-33-

extensions. By month six of the extension, Pennsylvania requested an additional two years. When the parties were unable to reach an agreement, Pennsylvania asked the district court to approve its request. Delaware Valley responded by seeking an order finding Pennsylvania in contempt and modifying the terms of the consent decree. The district court held Pennsylvania in contempt, refused to modify the decree, and denied Pennsylvania's requested extension, although a few months later it approved a one-year extension. Pennsylvania appealed both the district court's finding of contempt and its one-year extension, and lost both appeals. *See id*. at 550–51.

Phase V involved a battle of wills between the federal judiciary and the Pennsylvania legislature. The legislature enacted a law prohibiting the expenditure of state funds for implementation of the emissions program. *See id*. at 551. PennDOT therefore ceased all emissions-program activities after publishing final regulations for garage owners to conduct emissions inspections. Pennsylvania then sought to stay implementation of the decree, and Delaware Valley sought a finding of contempt and sanctions. The district court held Pennsylvania in contempt, denied a stay, and limited the Commonwealth's access to federal funds by ordering the United States Secretary of Transportation to cease approval of highway projects and grants in the Pittsburgh and Philadelphia areas unless they met certain criteria. The Commonwealth's appeal of this order was

denied.

In Phase VI the City of Pittsburgh and several legislators attempted to intervene in the litigation. *See id*. at 552. Delaware Valley successfully resisted these attempts. In Phase VII the district court reviewed seven projects that the United States Secretary of Transportation had funded and found that only two were allowable under the court's prior order. In Phase VIII the Pennsylvania legislature finally passed the legislation required to implement the emissions program and negotiated with Delaware Valley for a new implementation schedule, which the court approved. In Phase IX Delaware Valley successfully opposed Pennsylvania's efforts before the Environmental Protection Agency to reduce the size of the area in which the emissions plan was to be implemented.

Delaware Valley then sought attorney fees it had incurred since the consent decree had been entered. Much of the work for which it sought compensation involved postdecree litigation, but it also involved work in Phases II and IX before state and federal administrative agencies. The district court awarded fees for that work, and the Third Circuit affirmed.

Pennsylvania argued before the Supreme Court that the language of the attorney-fee provision of the Clean Air Act allowed recovery only for "costs of litigation," and that therefore Delaware Valley's administrative work in Phases II and IX was not compensable. *See id*. at 557–58. The Court disagreed, explaining

that counsel's work in those phases, although not traditional legal work,

> *was as necessary to the attainment of adequate relief for their client
> as was all of their earlier work in the courtroom which secured
> Delaware Valley's initial success in obtaining the consent decree.*
> This case did not involve a single tortious act by the Commonwealth
> that resulted in a discrete injury to Delaware Valley, nor was the
> harm alleged the kind that could be remedied by a mere award of
> damages or the entry of declaratory relief. Instead, Delaware Valley
> filed suit to force the Commonwealth to comply with its obligations
> under the Clean Air Act to develop and implement an emissions
> inspection and maintenance program covering 10 counties
> surrounding two major metropolitan areas. To this end, the consent
> decree provided detailed instructions as to how the program was to
> be developed and the specific dates by which these tasks were to be
> accomplished.
>    *Protection of the full scope of relief afforded by the consent
> decree was thus crucial to safeguard the interests asserted by
> Delaware Valley; and enforcement of the decree, whether in the
> courtroom before a judge, or in front of a regulatory agency with
> power to modify the substance of the program ordered by the court,
> involved the type of work which is properly compensable as a cost of
> litigation under § 304.* In a case of this kind, *measures necessary to
> enforce the remedy ordered by the District Court cannot be divorced
> from the matters upon which Delaware Valley prevailed in securing
> the consent decree.*

*Id*. at 558–59 (emphasis added). The Court therefore held that the postdecree
monitoring work in each phase was compensable.

Although the case arose under the Clean Air Act, the Court stated that the
Act's fee provision was intended to serve the same purpose as the fee provision in
42 U.S.C. § 1988—to encourage private citizens to enforce rights created under
federal law. The Court cited with approval several § 1988 cases that had awarded
attorney fees for postjudgment monitoring of consent decrees, and stated that the

-36-

fee provisions of the two statutes should be interpreted in the same manner. *See id.* at 559–60.

### B.     Tenth Circuit Precedent

Without relying on *Delaware Valley*, we have likewise held that some postdecree monitoring activity by plaintiffs' counsel is compensable. In *Duran v. Carruthers*, 885 F.2d 1492 (10th Cir. 1989), the plaintiff class, inmates in a New Mexico penitentiary, had brought suit against state officials alleging violations of their civil rights. In 1980 the parties entered into a comprehensive consent decree that set out detailed rules and regulations governing the operation of the prison. *See id.* Among other things the decree established an internal monitoring body. But the compliance monitor filed two reports highly critical of the defendants and was fired. The district court then appointed a special master to monitor the defendants' compliance. *See id.* at 1495.

The plaintiffs also monitored compliance and several times sought contempt citations. In addition, they opposed several efforts by the defendants to modify the decree. *See id.* at 1493. Although the consent decree remained in effect, many of the postdecree disagreements between the plaintiffs and the defendants were settled by mutual agreement. *See id.*

The plaintiffs sought attorney fees for their postdecree work. In awarding attorney fees, the district court held that the plaintiffs' "post-judgment services

necessary to reasonable monitoring of the consent decree were compensable under 42 U.S.C. § 1988." *Id*. The defendants challenged the fee award, arguing that because they conducted their own monitoring and a Special Master had been appointed to ensure compliance, the plaintiffs' monitoring was "essentially gratuitous, self-initiated and redundant, as well as being unnecessary, duplicative, and superfluous." *Id*. at 1495 (internal quotation marks omitted). Rejecting that argument, we stated that to hold that plaintiffs' monitoring work was unnecessary "would mean that the plaintiffs must accept reports of the Special Master and the defendants' own compliance officer at face value and they would be unable to make any real challenge . . . to such reports." *Id*. We noted that plaintiffs' attorneys were charged with continuing duties under the decree; in particular, they had the right to challenge in court any declaration of an emergency or any implementation of the decree. *See id*. "In short, the 1980 consent decree was only the beginning, and counsel for the plaintiffs has a continuing duty and responsibility to make sure that the defendants comply, and continue to comply, with the decree." *Id*. *See also Diaz v. Romer*, 961 F.2d 1508, 1511 (10th Cir. 1992) (subclass that was "part of the prisoner class that prevailed in the original litigation, which spawned subsequent stipulations and consent orders[,] . . . did not lose their prevailing-party status when they were named a subclass.")

The defendants also argued that the plaintiffs had not prevailed on a motion

-38-

to hold them in contempt because the plaintiffs had withdrawn it under an agreement with the defendants, and thus should not get fees related to the motion. But we noted that this agreement also required the defendants to withdraw their request to the court to modify the decree. Citing *Maher v. Gagne*, 448 U.S. 122 (1980), we said that plaintiffs were a prevailing party because "§ 1988 contemplates that there will be an award of attorneys' fees and costs if the plaintiff vindicates his or her rights through settlement." *Id*. at 1496. We affirmed the district court's award of attorney fees.

We also recognized a party's ongoing prevailing-party status in the postdecree phase in *Joseph A. v. New Mexico Department of Human Services*, 28 F.3d 1056 (10th Cir. 1994). The plaintiffs, foster children in New Mexico, had entered into a consent decree with the New Mexico Department of Human Services. The decree specifically authorized attorney fees for decree-monitoring work. *See id*. at 1058. The defendants appealed an award on the ground that it included compensation for a failed attempt to obtain a contempt order. *See id*. at 1059. We stated that although the degree of success was a consideration in the overall analysis of what fees to award, lack of success during the monitoring phase did not deprive them of prevailing-party status. We said: "[T]he fact that plaintiffs ultimately did not prevail in their efforts to secure a contempt order d[id] not divest them of their status as prevailing parties so long as the work done

was necessary to the overall effort." *Id.* at 1060. We noted that "it may be that the litigation of the contempt motion resulted in auxiliary or overall benefits to plaintiffs." *Id*. at 1061.

But more than prevailing-party status was necessary to sanction the award. Fees could be awarded only if "the effort expended was necessary and the fees requested . . . reasonable." *Id*. at 1060. Because "[f]ees are compensable only for work that is useful and of a type ordinarily necessary to secure the final result obtained," *id.* (internal quotation marks omitted), on remand the district court was to determine whether the defendants had in fact been failing to comply with the consent decree and whether the plaintiffs' failed motion for contempt had been "a necessary response," *id.* at 1061.

## C.    *Buckhannon*

In the City's view, however, *Duran*, *Joseph A.*, and perhaps even *Delaware Valley,* have been overruled, or at least limited, by *Buckhannon*, 532 U.S. 598. The issue before the Supreme Court in *Buckhannon* was the meaning of *prevailing party*. Buckhannon had brought suit against the State of West Virginia, seeking declaratory and injunctive relief, alleging that a statute requiring that residents of boarding homes be capable of "self-preservation" violated the Fair Housing Amendments Act of 1988. *Id.* at 600–01 (internal quotation marks omitted). Within a year of the suit's being filed, the West Virginia legislature eliminated

the requirement, and the district court dismissed the case as moot. *See id.* at 601. Buckhannon then requested attorney fees, arguing that it was a prevailing party because its lawsuit had been the impetus for the legislature's voluntary enactment of the statutory change. *See id.* (The view that attorney fees are compensable in such circumstances has been called the "catalyst theory" of fee shifting.) The district court denied attorney fees, and the Fourth Circuit affirmed. *See id.* at 602. The Supreme Court agreed. It stated, "A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur*" to make a party prevailing. *Id.* at 605. Because there was no "judicially sanctioned change in the legal relationship of the parties," *id.*, Buckhannon had not been a prevailing party.

To support its view that *Buckhannon* precludes the claim for attorney fees in this case, the City points to *Alliance to End Repression v. City of Chicago,* 356 F.3d 767 (7th Cir. 2004). In 1981 the *Alliance* plaintiffs had obtained a consent decree that restricted the city's authority to investigate alleged subversive activities. The decree did not grant the plaintiffs or their lawyers any monitoring or other responsibilities. *See id.* at 768. Nonetheless, over a period of seven years plaintiffs had brought two failed contempt proceedings and a failed opposition to the city's request to modify the decree, and had engaged in "efforts, which also bore no fruit so far as anyone can say, to monitor the city's

-41-

compliance with the decree—no fruit, that is, except the failed contempt proceedings." *Id*. at 769. Despite this lack of success the district court had awarded plaintiffs $1 million in attorney fees for these monitoring activities. The defendants appealed the award, and the court of appeals reversed.

The plaintiffs had argued that they were entitled to attorney fees because the consent decree made them prevailing parties for the entire life of the decree, which contained no end date. They also argued that they were "duty-bound to oppose the modification of the decree, to monitor compliance with the decree before and after it was modified, and to bring contempt proceedings against anyone who they thought might be violating it." *Id*. The court disagreed. The plaintiffs had relied on *Delaware Valley* to support their fee claim, but the court distinguished it because "those postjudgment proceedings were at least partly successful," while "[t]hese plaintiffs' postjudgment proceedings were not." *Id*.

Recognizing that other courts had awarded fees to plaintiffs who obtained no postdecree relief, *Alliance* distinguished some on the ground that the consent decree had specifically authorized attorney fees for plaintiffs' postdecree efforts and even then the plaintiffs' efforts had at least contributed to inducing compliance with the decree. The remaining cases awarding fees are best explained, said the court, as adopting the view that careful monitoring would deter violations of the decree. But "the rationale is attenuated in a case such as

this in which someone else—not the plaintiff—is the appointed monitor." *Id*. at 771. And, more importantly, that rationale is "inconsistent with the Supreme Court's rejection in *Buckhannon* of the 'catalyst' theory of fee-shifting." *Id*. The plaintiffs' failure to secure a successful outcome in the postjudgment phase made their efforts noncompensable. *See id*.

*Alliance* acknowledged the view of some courts that compensation might be appropriate if the failed effort was considered an offshoot of a successful pending case. But it rejected that view and, in any event, thought it inapplicable on the facts before it. "[T]he postjudgment proceedings here, coming as they did so many years after the consent decree went into effect, are clearly separable from the proceeding that led up to the entry of the decree." *Id*. "We do not think that our plaintiffs would argue that if a member of the class went to a lawyer who does not represent the class, and that lawyer filed a motion for contempt on behalf of his client and lost, the lawyer would be entitled to a fee, on the ground that the class member was a prevailing party by virtue of the consent decree." *Id*. at 772.

Finally, the court rejected the notion that the plaintiffs' attorneys had an ethical duty to oppose modification of and monitor the decree. Neither the original nor the modified decree imposed any duties on them. "They could have walked away from the case as soon as the consent decree was approved confident that a compliance machinery in which they had been given no role had been

established.  They would not have been letting down the class had they done so."

*Id*.  Although the court recognized that other courts, including this court in

*Duran*, had awarded fees to plaintiffs despite the existence of a separate entity to

monitor defendants' compliance with a consent decree, it stated that those cases

"do not survive *Buckhannon*."  *Id.*

### D.    Analysis

We are not persuaded by *Alliance*, at least as that opinion is interpreted by

the City.  It cannot be disputed that Plaintiffs have been prevailing parties in this

litigation.  The Supreme Court has held that a party that obtains a consent decree

is a prevailing party.  *See Maher*, 448 U.S. at 129.  *Buckhannon* does not cast

doubt on that proposition.  Moreover, *Buckhannon* does not purport to overturn,

or even limit, *Delaware Valley*; the *Buckhannon* opinion does not even mention

*Delaware Valley*.  In light of *Delaware Valley* and this circuit's precedents, we

cannot accept the proposition that attorney fees for postdecree efforts are

compensable only if they result in a judicially sanctioned change in the parties'

legal relationship.  The Decree itself was such a change, and attorney fees

incurred for reasonable efforts to enforce that change—that is, protect the fruits

of the Decree—are compensable.

On the other hand, we also depart from the Plaintiffs' view.  Their view is

an overbroad characterization of what constitutes protecting the fruits of the

decree. A lawyer's work should not be characterized as protecting the fruits of a decree just because it is directed at the same problem that the decree was directed at. When a decree establishes a particular mechanism for addressing the problem that motivated the initial lawsuit, the "fruit of the decree" is a properly functioning mechanism, not the elimination of the problem addressed by the mechanism. For example, the decree in *Delaware Valley* required implementation of an automobile-inspection program. So long as the program is functioning properly, the plaintiffs are enjoying the "fruits" of the decree. There may be owners who fail to bring their vehicles in for inspection. But attorney efforts to identify and pursue those persons should not be compensable as long as the Commonwealth's program is performing this task—say, by refusing to renew a vehicle's registration unless the vehicle has an inspection certificate. In other words, the role of the plaintiffs' attorney in protecting the fruits of victory is to ensure that the decree is being honored, not to ensure that the problems motivating the decree have been eliminated.

This was certainly the circumstance in *Delaware Valley*. The actions of counsel through each phase of that case were directed at establishing and continuing the vehicle-monitoring program, as required by the decree. The Supreme Court declared that "measures necessary to enforce the remedy ordered by the District Court cannot be divorced from the matters upon which Delaware

Valley prevailed in securing the consent decree." *Delaware Valley*, 478 U.S. at 559. In *Duran* and *Joseph A.* the particular efforts by the plaintiffs' attorneys are unclear, but we characterized them as monitoring performance of the decree.[6]

Of course, the decree itself can spell out what efforts by plaintiffs' counsel are to be compensated. Indeed, the amount of litigation on the subject suggests that explicit provisions in consent decrees would be a boon for all concerned (certainly the courts). But when, as here, the matter was not resolved in the decree itself, we must apply the above general principles, as informed by reasonable inferences from the decree's provisions.

Resolving the matter in this case is not an easy task. As we proceed to explain, we do not think that resolution is possible on the record before us, so we must reverse and remand for further proceedings. The difficulty in characterizing the efforts of Plaintiffs' counsel arises from the Decree's inclusion of some

_____

[6]Certain statements in *Duran* and *Joseph A.* might be read to support the "catalyst theory," and we recognize that such a reading is no longer defensible in light of *Buckhannon*. In our view, however, *Duran* and *Joseph A.* are more properly read to have predicated postdecree attorney fees on the necessity of the actions to preserve the plaintiffs' prior success in achieving a consent decree, and in this respect these opinions survive *Buckhannon*. *See Duran*, 885 F.2d at 1496. ("[T]he entry of the Court's judgment has not terminated the role of the plaintiffs' counsel. . . . Without determined, competent and dedicated representation, the provisions of this Consent Decree might have had little practical significance for the class members." (internal quotation marks omitted)); *Joseph A.*, 28 F.3d at 1059 ("While the degree of success plays a part in the overall analysis [of postdecree attorney fees], we think a more important inquiry is whether the work done was necessary to achieve the final result.").

provisions that set standards and other provisions that establish enforcement mechanisms. The standards include § 5, which requires that specialty assignments "be made on the basis of merit and fitness"; § 6, which requires hiring "on the basis of merit and fitness"; § 7, which requires that promotions likewise be based on merit and fitness; and § 13, which forbids retaliation against anyone who raises "matters of public concern," including complaints of discrimination. The enforcement mechanisms include creation of the Dispute Resolution Committee in § 21, the creation of an Independent Auditor in § 26, and the reorganization of the Internal Affairs Section in § 11 to include an Investigations Squad and an Audit and Inspections Squad.

One could argue that a violation of any standard or enforcement provision constitutes a violation of the Decree, and that Plaintiffs' counsel should be reimbursed for all efforts to "enforce" the Decree by identifying and correcting such a violation. In our view, however, the Decree is best read as establishing enforcement mechanisms to prevent, detect, and remedy violations of the standards. The fruit of the Decree is the proper functioning of those mechanisms. As in any large bureaucracy, violations of the standards will occur; but if the enforcement mechanisms function properly to prevent, detect, and remedy

violations, the Decree is serving its purpose.[7] After all, the standards are, in intent and essence, restatements of the requirements of antidiscrimination law upon which the original suit was based. To say, for example, that promotion should be based on merit and fitness is to say that promotion should not be on the basis of race, religion, etc. Thus, the standards are not the fruit of the Decree. The fruit is the establishment of the mechanisms to ensure compliance with antidiscrimination law; the purpose of the provisions setting standards is to set the goals for enforcement mechanisms and the criteria for measuring their performance. If those who have been treated improperly—because, for example, they are the subject of retaliation or because promotion was not based on merit—generally obtain relief from the mechanisms established by the Decree, then the mistreated persons have enjoyed the fruit of the decree.

One might argue that another fruit of the Decree is to provide free legal services during the life of the Decree to anyone who claims injury from a violation of a standard set out in the Decree. But we decline to infer that purpose of the Decree in the absence of explicit language, particularly when the Decree sets a modest upper limit on compensation of the Independent Auditor and its

---

[7]"Proper" functioning does not mean "perfect" functioning. No system works perfectly. Mistakes are inevitable and, inevitably, some individual cases of mistreatment will not be adequately redressed. Occasional errors do not necessarily establish systemic failure or deprive the class of the fruits of the decree.

explicit provisions on attorney fees address only claims based on pre-Decree misconduct. Although we reject the Seventh Circuit's suggestion in *Alliance* that the strictures of *Buckhannon* govern all postdecree efforts by the attorneys who obtained the decree, *see Alliance*, 356 F.3d at 771, we share that court's reluctance to treat a class-action decree as a "gravy train" that provides attorneys a "guaranteed lifetime income," *id*. at 773.

To consider the matter from a somewhat different perspective, it is worth noting the special status of class counsel and the limits on that status. Ordinarily, all matters relating to the class action must be handled by class counsel. *See* Fed. R. Civ. P. 23(g); *McNeil v. Guthrie*, 945 F.2d 1163 (10th Cir. 1993). The class action can be unmanageable if the class cannot speak with one voice. On the other hand, one who is an intended beneficiary of a consent decree may pursue personal relief in an action to enforce the decree. *Cf. Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280 (D.C. Cir. 1993) (pilots who were nonparties could seek enforcement of class-action consent decree to receive full payment of money due them). (We note that the Decree's provision for attorney fees arising from claims for pre-Decree discrimination does not appear to require such claims to be brought only by class counsel.) Applying these propositions to the case before us, only class counsel should be able to enforce the Decree's requirements regarding the proper functioning of the Decree's enforcement mechanisms. But an attorney

retained by a particular officer could seek relief based on the TPD's post-Decree failure to, say, promote him based on merit and fitness. Such a personal attorney could have no claim for reimbursement of fees under the Decree. When class counsel is performing a task that can be performed only by class counsel— namely, addressing systemic failure of the Decree's enforcement mechanisms— compensation under the Decree may be appropriate. When, however, class counsel is performing a task that an officer's personal counsel could perform, class counsel should be no more entitled to fees under the Decree than would the personal attorney.

How, then, to characterize the efforts by Plaintiffs' counsel, who are class counsel? From what we can tell, much, or even most, of the efforts were to assist various clients in pursuing complaints within the mechanisms established or modified by the Decree. Utilizing the Decree's enforcement mechanisms is not in itself protecting the fruits of the Decree; rather, it is taking advantage (quite properly) of the Decree. On the other hand, if Plaintiffs' counsel can point to efforts designed to ensure that the Independent Auditor, the Dispute Resolution Committee, or the Internal Affairs Section is properly performing its duties, compensation for those efforts may be appropriate. Some efforts by Plaintiffs' counsel may involve elements of both utilizing the enforcement mechanisms and ensuring their proper functioning; in that event, apportionment of fees may be

called for. We leave to the district court in the first instance to determine what part of those efforts were in fact monitoring the enforcement mechanisms to ensure against systemic failures. We note, however, that in assessing what compensation is due for monitoring efforts, the court must take into account that the Decree itself provides for neutral monitoring by the Independent Auditor; attorney efforts are compensable only if they are reasonable. Moreover, though counsel's efforts may be compensable despite the absence of a court order, the effort must still be effective—for example, by convincing the City to comply without obtaining a court order. In particular, failed efforts could rarely justify attorney fees.

Finally, we observe that our approach is not inconsistent with the ethical obligations imposed on class counsel by our opinion in *Duran*, 885 F.2d at 1495. Plaintiffs contend that *Duran* required their attorneys to engage in the actions for which we would deny them compensation. They quote *Duran* for the proposition that "counsel for the plaintiffs has a continuing duty and responsibility to make sure that the defendants comply, and continue to comply, with the decree." 885 F.2d at 1495. But that declaration was founded on language in specific provisions of the consent decree in that case. In any event, our holding is not contrary to the quoted proposition. Plaintiffs' counsel is entitled to compensation for reasonable

efforts to preserve the fruits of the decree.[8]

## III.   CONCLUSION

We REVERSE the district court's holding that *Buckhannon* precludes an award of attorney fees to Plaintiffs for the post-Decree efforts of their counsel, and REMAND for a determination of whether Plaintiffs are entitled to attorney fees for those efforts, and if so, the amount to be awarded.  We GRANT Plaintiffs-Appellants' Unopposed Motion for Leave of Court to File Documents Under Seal.

---

[8] There is considerable uncertainty regarding the ethical duties of class counsel.  *See* Nancy J. Moore, *Ethics Matters, Too: The Significance of Professional Regulation of Attorney Fees and Costs in Mass Tort Litigation—A Response to Judith Resnick*, 148 U. Pa. L. Rev. 2209, 2221 (2000); Nancy J. Moore, *Who Should Regulate Class Action Lawyers?*, 744 PLI/Lit 701, 704–05, PLI Order No. 8588 (July 2006) (noting that neither the Model Code of Professional Responsibility nor the Model Rules of Professional Conduct specifically addresses the ethical obligations of class-action lawyers).

05-5064  *Johnson v. City of Tulsa*

**O'BRIEN**, J., concurring


I take our decision to preclude attorney fees for class counsel to the extent they are incurred in duplicating, or attempting to establish an alternative to, the Decree's enforcement mechanisms.  For example, a claim of systemic failure brought by class counsel might be little more than a thinly disguised attempt to have the district court review a decision (even an erroneous one) rendered in accordance with the Decree's enforcement mechanisms.  With that understanding, I join the opinion.