17-3538-cv
*P.J. ex rel. W.J. v. Conn. Bd. of Educ.*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term 2018

(Argued: January 22, 2019      Decided: July 25, 2019)

No. 17-3538-cv

_____

P.J., BY & THROUGH HIS PARENTS & NEXT FRIENDS MR. & MRS. W.J.; L.G., BY & THROUGH HER PARENTS & NEXT FRIENDS MR. & MRS. L.G.; M.L., BY & THROUGH HIS PARENTS & NEXT FRIENDS MR. & MRS. J.L.,

*Plaintiffs-Appellees,*

IAN KATZ, BY & THROUGH HIS PARENTS AND NEXT FRIENDS MR. & MRS. MARK KATZ; CONNECTICUT ASSOCIATION FOR RETARDED CITIZENS, INC.; COALITION FOR INCLUSIVE EDUCATION; CONNECTICUT COALITION OF CITIZENS WITH DISABILITIES; PEOPLE FIRST, INC.,

*Intervenors-Plaintiffs-Appellees,*

-v.-

CONNECTICUT STATE BOARD OF EDUCATION; GERALD TIROZZI, COMMISSIONER OF THE CONNECTICUT STATE DEPARTMENT OF EDUCATION,

*Defendants-Appellants.*[*]

---

[*] The Clerk of Court is respectfully directed to amend the official caption as set forth above.

_____

Before:     KEARSE, SACK, and LIVINGSTON, *Circuit Judges*.

Plaintiffs-Appellees and Intervenors-Plaintiffs-Appellees (collectively, "Plaintiffs-Appellees")—four children with intellectual disabilities, their parents, and several organizations dedicated to vindicating their rights—sued the State of Connecticut in 1991 on behalf of a statewide class of children with intellectual disabilities for, *inter alia*, failing to comply with the requirement in the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, that children with disabilities be educated in the "least restrictive environment" that meets their needs. *See id.* § 1412(a)(5). The parties negotiated a settlement agreement that included a payment of $675,000 in fees for Plaintiffs-Appellees' counsel. Over the eight-year life of the agreement, Plaintiffs-Appellees took many steps to monitor the State's compliance with the settlement agreement but received no further court-ordered relief in their favor. Near the end of the agreement's term, Plaintiffs-Appellees' counsel moved for additional attorneys' fees, which Defendants-Appellants opposed on several grounds. While we agree with the orders of the United States District Court for the District of Connecticut (Chatigny, *J.*) that counsel is not barred from further attorneys' fees by the text of the settlement agreement or the definition of "prevailing party" contained in *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598 (2001), we disagree with the court's application of the standard outlined in *Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air*, 478 U.S. 546 (1986), as to several categories of work for which the court awarded fees.

Accordingly, the September 30, 2017 order of the district court, awarding Plaintiffs-Appellees $470,727.57 in attorneys' fees and costs, is AFFIRMED in part and VACATED in part. We REMAND for further proceedings consistent with this opinion.

FOR PLAINTIFFS-APPELLEES AND
INTERVENORS-PLAINTIFFS-APPELLEES: DAVID C. SHAW, Simsbury, CT.

2

FOR DEFENDANTS-APPELLANTS:     DARREN   P.   CUNNINGHAM,   Assistant Attorney General, *for* George Jepsen, Attorney General, Hartford, CT.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

Defendants-Appellants—the Connecticut State Board of Education, and Commissioner of the Connecticut State Department of Education Gerald Tirozzi— appeal several orders of the United States District Court for the District of Connecticut (Chatigny, *J.*, Martinez, *M.J.*) awarding Plaintiffs-Appellees and Intervenors-Plaintiffs-Appellees (collectively, "Plaintiffs-Appellees") attorneys' fees and costs for work done in the wake of a court-approved settlement entered into by the parties in March 2002.   This suit began over 25 years ago, when Plaintiffs-Appellees sued Defendants-Appellants, alleging violations of, *inter alia*, the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* Since then, the case has had a "tortuous history."   *See* Special Appendix ("S.A.") 33.

Defendants-Appellants argue that the district court erred in its award of fees for three reasons: (1) the parties' 2002 settlement agreement ("Settlement Agreement" or "Agreement") by its terms precludes Plaintiffs-Appellees from receiving any fees beyond the $675,000 they were paid at the Agreement's

3

execution; (2) the Supreme Court's decision in *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598 (2001), precludes the award of fees in a situation like this, where a party has not received any additional court-ordered relief in the aftermath of a court-approved settlement; and (3) even if *Buckhannon* does not preclude additional relief, the majority of the work done by Plaintiffs-Appellees does not fall within the "useful and of a type ordinarily necessary" standard articulated in *Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air*, 478 U.S. 546, 561 (1986) (internal quotation marks omitted), and is thus not compensable. We do not interpret the Settlement Agreement to preclude the award of post-settlement attorneys' fees. Furthermore, we disagree with Defendants-Appellants' argument that *Buckhannon sub silentio* overruled *Delaware Valley* and barred any award of fees here. We agree with Defendants-Appellants, however, that as to several categories of work for which the district court awarded fees, the court misapplied the *Delaware Valley* standard.

Therefore, we AFFIRM in part and VACATE in part the September 30, 2017 order of the district court awarding Plaintiffs-Appellees $470,727.57 in attorneys'

fees and costs.   We REMAND for further proceedings consistent with this opinion.

## BACKGROUND

### I.   Factual Background[1]

Plaintiffs-Appellees, initially just several Connecticut "school-aged children with intellectual disabilities and their families," S.A. 33, brought suit in the United States District Court for the District of Connecticut in 1991.   They were later joined by several organizations "created by parents, disabled citizens and professionals to enforce the rights of persons with disabilities."   Joint Appendix ("J.A.") 100 (Third Amended Complaint).   The students alleged that they had attempted to obtain placement in "regular classrooms in their neighborhood schools," but had been rejected by the local boards of education due to bias and

---

[1] The factual background presented here is derived from facts found by the district court in determining Plaintiffs-Appellees' entitlement to fees following approval of the Settlement Agreement.   As this is an appeal of an award of attorneys' fees, we accept these facts unless they are "clearly erroneous."   *See Shepherd v. Goord*, 662 F.3d 603, 605-06 (2d Cir. 2011) (noting that "[w]e review a district court's award of attorney's fees for abuse of discretion," which may include "a clearly erroneous assessment of the evidence").   To the extent Defendants-Appellants take issue with the district court's recitation of the facts—such as how Section X came to be in the Settlement Agreement— "the District Court [did not] abuse its discretion in crediting" Plaintiffs-Appellees' evidence over Defendants-Appellants' evidence, *Z.B. ex rel. I.B. v. N.Y.C. Dep't of Educ.*, 336 F.3d 79, 81 (2d Cir. 2003), particularly in light of Magistrate Judge Martinez's close observation of the settlement process, *see generally* S.A. 1-7.

5

prejudice. *Id.* They brought suit under, *inter alia*, the IDEA requirement that children with disabilities, to the greatest extent possible, be educated in regular classes with children who are not disabled, *i.e.*, that they be placed in the "least restrictive environment" suitable to meet their needs. *See* 20 U.S.C. § 1412(a)(5); *see also* 34 C.F.R. § 300.114.

In December 1993, a class was certified of "[a]ll mentally retarded school-age children in Connecticut who have been identified as needing special education and who, on or after February 20, 1991 are not educated in regular classrooms." J.A. 24-25. The matter was tried before District Judge Chatigny in early 2000. Before the court rendered a verdict, however, the parties entered into settlement negotiations with the help of Magistrate Judge Martinez. "The negotiation process was bifurcated: the initial phase addressed the merits of the case and the second phase was to focus on attorneys' fees." S.A. 2-3.

In November 2000, the parties successfully reached a draft agreement on the substantive provisions of their settlement. That agreement contained five primary goals, including, *inter alia*, that the Connecticut State Department of Education would "increase . . . the percent" of students with intellectual disabilities who participate in classes and extracurricular activities with non-

6

disabled students. The draft agreement provided for the establishment of an "Expert Advisory Panel" ("EAP") consisting of four individuals, two selected by each of the parties. The EAP would, among other things, advise Connecticut in its implementation of the agreement, provide feedback on annual reports to be prepared by the State, and make recommendations on how best to implement the agreement's goals. The agreement also provided that Plaintiffs-Appellees were entitled to collect data on the class, and the State was generally obligated to cooperate in providing them with these data. The district court was to retain jurisdiction over the agreement for, at most, eight years; however, the parties agreed that after the first five years following the empaneling of the EAP, the court would have jurisdiction to consider only Plaintiffs-Appellees' motions for substantial noncompliance, if any were made.

Having settled on the substance of their agreement, the parties turned to negotiating attorneys' fees. Magistrate Judge Martinez asked Plaintiffs-Appellees' counsel to provide the court with all fee requests for work done up to November 28, 2000, the point when the parties began negotiating fees. Counsel for Plaintiffs-Appellees initially demanded payment of $972,115.91, but the parties ultimately agreed on $675,000. As of May 18, 2001, however, when the parties

7

met with the Magistrate Judge to discuss some unrelated language in the draft agreement, the draft itself contained no language concerning attorneys' fees.

Under state law, the settlement agreement had to be approved by the Connecticut legislature. On June 6, 2001, Plaintiffs-Appellees learned that the draft agreement had been submitted to and accepted by the Connecticut General Assembly. But the agreement accepted by the legislature included a new provision absent from the draft agreement: Section X, entitled "Payment." That section provided as follows:

> The Defendants shall make to the Plaintiffs in P.J., et al v. State of Connecticut Board of Education, et al, a one-time payment of $675,000.00 in attorneys' fees and costs, payable to Attorney David Shaw, attorney for the Plaintiffs, within ninety (90) days of the effective date of the approval of this agreement.

J.A. 159 (Settlement Agreement). Plaintiffs-Appellees, who had not agreed to this additional section, protested to the Magistrate Judge, arguing that the inclusion of such a section, along with its "one-time payment" language, suggested that $675,000 would be the *only* payment counsel was entitled to receive, even though the parties had not in fact agreed on a waiver of future fees. When the parties were unable to agree on additional language to clarify the meaning of this new

8

section, Plaintiffs-Appellees moved to enforce the draft settlement agreement without Section X.

Magistrate Judge Martinez held yet another settlement conference with the parties in February 2002 in an effort to save the settlement. At this conference, the parties agreed on certain language to be included in a side letter regarding Section X, subject to discussions with Connecticut's legislative leadership.[2] This additional language is contained in a letter dated March 1, 2002 (the "Side Letter"), from Defendants-Appellants' counsel to Plaintiffs-Appellees' counsel, and provides as follows:

> [T]he defendants do not interpret Section X of the draft agreement to preclude the Court from awarding reasonable attorneys' fees and costs to the plaintiffs upon a finding by the Court that the defendants had failed to substantially comply with the consent decree. The parties agree to be bound by controlling law on the issue of attorneys' fees and costs.

S.A. 6. Upon reaching agreement on the Side Letter, the parties executed the Settlement Agreement on March 28, 2002. The court approved the settlement on May 22, 2002, following a fairness hearing.

---

[2] According to Magistrate Judge Martinez, Defendants-Appellants thereafter "sought and obtained approval for the proposed additional language." S.A. 6.

After the Settlement Agreement went into force, the parties empaneled the EAP on August 12, 2002, which met with state and local education officials and made recommendations on how Defendants-Appellants could best comply with the Agreement. "The defendants issued annual reports and provided extensive data to the plaintiffs and the EAP regarding their efforts and progress." S.A. 38. After five years, Defendants-Appellants disbanded the EAP. Plaintiffs-Appellees filed a motion for substantial noncompliance in April 2009, which led to an evidentiary hearing before the district court in June 2010. The district court ultimately denied that motion, concluding that Defendants-Appellants had made substantial progress toward meeting the Agreement's goals, and that neither the early disbanding of the EAP, nor any alleged issues with reclassification of class members—which Plaintiffs-Appellees claimed Defendants-Appellants did to obscure their actual progress toward Agreement goals—was sufficient to merit a finding of "substantial noncompliance." *Id.* at 40. Plaintiffs-Appellees appealed the ruling, but this Court affirmed. *See P.J. ex rel. W.J. v. Conn. Bd. of Educ.*, 550 F. App'x 20, 23 (2d Cir. 2013) (summary order). Throughout the life of the Agreement, Plaintiffs-Appellees also made many motions related to discovery,

Defendants-Appellants' compliance, and attorneys' fees. None of these efforts resulted in any court-ordered relief.

## II. Procedural History

On July 27, 2010, Plaintiffs-Appellees filed the motion for attorneys' fees and costs that is the subject of this appeal. They requested $906,010.85 in attorneys' fees and $197,181.15 in costs, including fees for work done from November 29, 2000, through March 20, 2002 (that is, after Plaintiffs-Appellees originally provided the court with their fee request during negotiations, but before execution of the Agreement), and from March 2002 through the 2010 filing of the instant motion. Most of the requested fees are for what the magistrate judge characterized as "post-judgment monitoring and enforcement." S.A. 8.

The district court first considered whether Plaintiffs-Appellees were entitled to seek fees beyond the $675,000 referenced in the Settlement Agreement, the terms of which Defendants-Appellants argued precluded any *additional* fee awards. Second, the court considered whether additional fees were barred by the Supreme Court's decision in *Buckhannon*. Although the "prevailing party" is entitled to obtain attorneys' fees in cases like this one, *Buckhannon* defined a "prevailing party," as that term is used in federal fee-shifting statutes, as one who has obtained

11

a "judicially sanctioned change in the legal relationship of the parties."[3]    532 U.S. at 605.    Defendants-Appellants contended that Plaintiffs-Appellees had obtained no judicially sanctioned change in the parties' legal relationship since the settlement, and thus were not a "prevailing party," barring post-settlement fee awards under *Buckhannon*.    The district court disagreed with Defendants-Appellants on both counts, adopting Magistrate Judge Martinez's recommended ruling that Plaintiffs-Appellees were not precluded from seeking an award of attorneys' fees and costs beyond the $675,000 obtained under the Settlement Agreement.

After determining that Plaintiffs-Appellees could seek further fees, the district court considered the numerous categories of fees for which Plaintiffs-Appellees were seeking payment.    Magistrate Judge Martinez, in her recommended ruling regarding the fee motion, characterized the work for which fees were requested as falling within six distinct categories: (1) negotiating the pre-settlement claim; (2) notifying class members of the settlement; (3) empaneling the

---

[3] Plaintiffs-Appellees moved for fees "pursuant to 20 U.S.C. § 1415(i)(3)(B), 29 U.S.C. § 794 and 42 U.S.C. § 1988."    J.A. 767 (2010 Attorneys' Fees Motion).    Although *Buckhannon* involved other federal fee-shifting statutes, its interpretation of "prevailing party" is applicable here.    *Buckhannon*, 532 U.S. at 602-03 & n.4; *see also N.Y. State Fed'n. of Taxi Drivers, Inc. v. Westchester Cty. Taxi & Limousine Comm'n*, 272 F.3d 154, 158 (2d Cir. 2001).

EAP; (4) monitoring implementation of the Settlement Agreement; (5) litigating attorneys' fees; and (6) litigating and pursuing a writ of mandamus. *See* S.A. 46-47. The fourth category, monitoring, contained the lion's share of the hours requested and was split into subcategories by the Magistrate Judge as she assessed what was compensable. Applying the Supreme Court's analysis in *Delaware Valley*, Magistrate Judge Martinez recommended that Plaintiffs-Appellees be awarded $321,165 in fees and $3,987.57 in costs. *Id.* at 88. The district court made several alterations to this recommendation, ultimately awarding $466,740 in fees and $3,987.57 in costs.[4] *See id.* at 90-92. Defendants-Appellants appealed the award, arguing not only that the district court had abused its discretion in awarding certain categories of fees to Plaintiffs-Appellees under the *Delaware Valley* standard, but also that Plaintiffs-Appellees should not have been allowed to receive any additional fees in the first place.

---

[4] The order approving in part and adopting in part the Magistrate Judge's recommended ruling—with a resulting award of fees and costs of $470,727.57—was dated September 30, 2017. *See* Ruling and Order, *P.J. ex rel. W.J. v. Conn. Bd. of Educ.*, No. 91-cv-180 (D. Conn. Sept. 30, 2017), ECF No. 846. However, the subsequent entry on the docket ordering the award provided for only $441,000.00 in fees, with no explanation for the approximately $25,000 difference. *See id.* at ECF No. 847. Plaintiffs-Appellees filed a motion for reconsideration under Federal Rule of Civil Procedure 60(a), for clerical mistakes, in May 2018. *See id.* at ECF No. 872. This motion was granted on May 17, 2018, resulting in a docket entry reflecting the total reached by the district court's September 30, 2017 order. *See id.* at ECF No. 873.

## DISCUSSION

We resolve this case using the same framework as the district court. First, we consider whether Plaintiffs-Appellees may seek any additional fees (1) pursuant to the Settlement Agreement and (2) consistent with Supreme Court precedent. After answering those questions in the affirmative, we then turn to the particular categories of work for which the district court awarded fees to assess what is compensable under *Delaware Valley*.

### I

Consent decrees, such as the Settlement Agreement here, are construed as contracts. *See Broadcast Music, Inc. v. DMX Inc.*, 683 F.3d 32, 43 (2d Cir. 2012). As such, "[w]hen the language of a consent decree is unambiguous, deference is paid to the plain meaning of the decree's language." *Id.* However, if a consent decree is deemed ambiguous, "a court may consider extrinsic evidence to ascertain the parties' intent, including the circumstances surrounding the formation of the decree." *United States v. Broadcast Music, Inc.*, 275 F.3d 168, 175 (2d Cir. 2001) (quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1059 (2d Cir. 1995)). "Where all the relevant extrinsic evidence is on the appellate record, we may determine for ourselves the parties' intent." *King*, 65 F.3d at 1059. While we review the

14

district court's factual findings for clear error, we review its interpretation of a consent decree *de novo*. *DMX Inc.*, 683 F.3d at 43.

Defendants-Appellants first argue that Plaintiffs-Appellees should be barred from requesting any additional fees and costs under the terms of the Settlement Agreement. As noted above, Section X of the Settlement Agreement provides for a "one-time payment of $675,000.00 in attorneys' fees and costs" within 90 days of the Agreement's effective date. J.A. 160 (Settlement Agreement). Section XI provides that the Agreement itself "contains the complete and sole agreement of the parties." *Id.* These provisions together, Defendants-Appellants argue, unambiguously preclude Plaintiffs-Appellees from receiving any additional fees and costs, at least "absent supplementary court-ordered relief." Def.-App. Br. at 40. For the following reasons, we disagree.

In determining that the Settlement Agreement did not waive Plaintiffs-Appellees' right to seek future fees and costs, the Magistrate Judge correctly concluded that "[t]he plain and unambiguous language of the settlement agreement does not manifest an intent to waive plaintiffs' statutory right to seek attorneys' fees." S.A. 14-15. Though Defendants-Appellants cite to several cases in an attempt to show that the Agreement's language *does* manifest such an

15

intent, the cases cited are not analogous. In *Lide v. Abbott House*, No. 5-cv-3790, 2008 WL 194656 (S.D.N.Y. Jan. 23, 2008), for instance, the court concluded that a settlement payment of $1.375 million "in exchange for releases, general release and a stipulation of discontinuance, without costs, without interest, and in full satisfaction of the claims" constituted a waiver of attorneys' fees; the court reasoned that "'an agreement utilizing the broad language of the release . . . accompanied by a stipulation that the case [would] be dismissed "without costs to any party,"'" was, in the absence of circumstances indicating otherwise, "'intended to settle *all claims* involved in the particular litigation, including a claim for attorney's fees.'" *Id.* at *1 (emphasis added) (quoting *Brown v. Gen. Motors Corp.*, 722 F.2d 1009, 1012 (2d Cir. 1983)). But the Settlement Agreement here does not contain a broad release akin to the one in *Lide*. *Cf. Valley Disposal, Inc. v. Cent. Vt. Solid Waste Mgmt Dist.*, 71 F.3d 1053, 1060 (2d Cir. 1995) (noting our reticence to find a waiver of attorneys' fees under 42 U.S.C. § 1988 absent a broad mutual release or some other indication that the settlement is without costs to either party). Nor does it provide for dismissal without future fees and costs. We agree with the Magistrate Judge that the phrase "one-time payment," without more, does not unambiguously evince an agreement to waive all rights to payment

16

for future work, a subject neither implicitly nor explicitly addressed in the Agreement.

We further agree with Plaintiffs-Appellees that, even if we were to deem Section X ambiguous, extrinsic evidence serves only to bolster Plaintiffs-Appellees' claim. Defendants-Appellants argue that as the language of Section X did not change from the time Plaintiffs-Appellees protested its inclusion to the time the parties executed the Agreement, the Agreement's execution must signal Plaintiffs-Appellees' capitulation to Defendants-Appellants' interpretation. *See* Def.-App. Br. at 52 ("The 'side letter' reflects that the Class made a knowing decision to capitulate on their previously held position not to sign the Agreement because of Section X."). However, the Side Letter explicitly says the parties agree to "be bound by controlling law" on attorneys' fees, and further makes clear that Defendants-Appellants themselves do not understand Section X to preclude the award of future fees in at least one instance: upon a judicial finding of substantial noncompliance by Defendants-Appellants with the Agreement. As Magistrate Judge Martinez (who helped the parties negotiate the Side Letter to save the settlement) noted, "the side letter was a linchpin in the parties' agreement to

resolve the case," and "reflects the parties' agreement that Section X was not a complete bar to future fees."   S.A. 16.

In sum, we conclude that the Settlement Agreement itself does not constitute a waiver of Plaintiffs-Appellees' statutory entitlement to seek future attorneys' fees and costs in connection with work performed subsequent to the Agreement's execution.   We next consider whether the present award is nevertheless precluded by the Supreme Court's decision in *Buckhannon*.

## II

We review for abuse of discretion a district court's award of attorneys' fees under the fee-shifting statutes at issue here.   *See Z.B. ex rel. I.B. v. N.Y.C. Dep't of Educ.*, 336 F.3d 79, 80 (2d Cir. 2003).   However, we review *de novo* the court's interpretation of the relevant fee statutes and, in particular, we "interpret[] the IDEA fee provisions in consonance with those of other civil rights fee-shifting statutes."   *R.V. ex rel. A.R. v. N.Y.C. Dep't of Educ.*, 407 F.3d 65, 73 (2d Cir. 2005) (internal quotation marks omitted).   Defendants-Appellants argue that the Supreme Court's decision in *Buckhannon* abrogated its earlier holding in *Delaware Valley* that, in appropriate circumstances, "postjudgment monitoring of a consent decree is a compensable activity for which counsel is entitled to a reasonable fee."

18

*Delaware Valley*, 478 U.S. at 559.    Instead, Defendants-Appellants contend,

pursuant to *Buckhannon*, a party to a consent decree cannot be considered the

"prevailing party" in the post-decree phase unless that party prevails in post-

decree *litigation*.    As a result, because Plaintiffs-Appellees did not prevail in any

of their many post-decree motions, including motions seeking a determination

that Defendants-Appellants were in substantial noncompliance, Defendants-

Appellants argue that Plaintiffs-Appellees cannot recover additional fees and

costs.    We disagree.

In *Buckhannon*, the Court considered the "catalyst theory."    That theory

posited that a plaintiff who supposedly achieved her desired result in a case, but

did so because of *voluntary* conduct by the defendant rather than because of a win

in court, could nevertheless be deemed a "prevailing party" for purposes of fee-

shifting statutes.    532 U.S. at 601-02.    But the Court rejected the catalyst theory,

concluding that a "prevailing party" must be "one who has been awarded some

relief *by the court*."    *Id*. at 603 (emphasis added).    This relief could be a judgment

on the merits, or a court-ordered consent decree.    *Id.* at 604.    To require less, as

the catalyst theory would, risked transforming a request for attorneys' fees into "a

second major litigation," *id.* at 609 (quoting Hensley), because district courts

19

would be required to analyze a defendant's subjective motivations for any change of conduct and determine whether the change was really a response to the plaintiff's meritorious legal claims.[5] *Id.* at 609-10.

At least one circuit has concluded that unless a consent decree itself provides for the award of post-consent decree fees, *Buckhannon*'s definition of a "prevailing party" generally bars such fees absent a subsequent court order in that party's favor. *See Alliance to End Repression v. City of Chicago*, 356 F.3d 767 (7th Cir. 2004); *see also United States v. Tennessee*, 780 F.3d 332, 339 (6th Cir. 2015) (concluding that the Sixth Circuit "need not . . . take sides in the circuit split," but nonetheless requiring a court order as part of its "three-part test" for awarding post-decree fees). In *Alliance*, the Seventh Circuit distinguished previous cases in which post-decree fees were awarded for attorneys' efforts to monitor compliance. These cases, the court concluded, were motivated by a "deterrence rationale" that it deemed inconsistent with *Buckhannon*'s rejection of the "catalyst theory." *Id.* at 771 (describing the "deterrence rationale" as based on the theory that "careful monitoring reduces the likelihood that the decree will be violated"). On the facts

---

[5] The *Buckhannon* majority further reasoned that application of the catalyst theory might actually cause a defendant to *refrain* from voluntarily changing its conduct, as liability for attorneys' fees could be more significant than liability on the merits. *See* 532 U.S. at 608.

of the case before it, moreover, involving a decree without a sunset provision and in which "someone else—not the plaintiff—[was] the appointed monitor," *id.* at 771, the *Alliance* court found the deterrence rationale particularly unpersuasive, noting that consent decrees are not to be appropriated by attorneys as "a lawyer's gravy train," *id.* at 773.

We, like the *Alliance* court, "do not see the sense" of an arrangement in which the mere entry of a consent decree affords a prevailing party's lawyers a "guaranteed lifetime income" for "bringing and losing a series of actions to enforce the decree" while charging the expense to the other side. *Id.* At the same time, however, and joining the majority of other circuits to have considered the question, we conclude that *Buckhannon* neither limits nor overturns *Delaware Valley*, which it does not even mention. *See Prison Legal News v. Schwarzenegger*, 608 F.3d 446 (9th Cir. 2010); *Johnson v. City of Tulsa*, 489 F.3d 1089 (10th Cir. 2007); *Cody v. Hillard*, 304 F.3d 767 (8th Cir. 2002). Under the rule announced in *Buckhannon*, a consent decree *is* a "judicially sanctioned change in the parties' legal relationship" such that the recipient of such an order is a "prevailing party." *Johnson*, 489 F.3d at 1108. And *Delaware Valley* affirms, without reference to any requirement of *additional* court-ordered relief, that appropriate efforts by counsel

21

to safeguard the scope of relief that a consent decree affords may be compensable. *See* 478 U.S. at 558-59. We thus conclude that *Delaware Valley* has not been abrogated *sub silentio* by *Buckhannon*, and that there is no categorical requirement of additional court-ordered relief for attorneys to be eligible for fees during the post-consent decree phase. *See State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("[I]t is [the Supreme] Court's prerogative alone to overrule one of its precedents."). Moreover, we do not believe that proper application of *Delaware Valley* allows lawyers to transform a consent decree into a "gravy train." *Alliance*, 356 F.3d at 773. We now turn to the question whether *Delaware Valley*'s principles were properly applied in this case.

### III

### A

In *Delaware Valley*, the Supreme Court considered an award of attorneys' fees to the Delaware Valley Citizens' Council for Clean Air ("Delaware Valley"), which had sued the Commonwealth of Pennsylvania under the Clean Air Act to compel Pennsylvania to implement a vehicle inspection and maintenance program. 478 U.S. at 549. In response to the suit, Pennsylvania agreed to a consent decree in which it committed to establishing such a program in several

22

counties within the next two years. *Id.* However, "implementation of the . . . program did not proceed smoothly," *id.* at 549, and Delaware Valley was forced to defend the decree not only in court, but also before both state and federal administrative agencies. *See id.* at 549-53. The district court awarded fees for this post-decree work, which Pennsylvania ultimately appealed to the Court. *See id.* at 553-57. To analyze the award of attorneys' fees, the Court employed a "phase" system, in which it divided the post-decree work engaged in by Delaware Valley into nine phases. *Id.* at 549-53. These phases included, *inter alia*, Delaware Valley's successful motions for contempt, its defense against motions to modify the decree, and its time spent commenting on proposed regulations and in hearings before the Environmental Protection Agency. *Id.*

Pennsylvania, in arguing to the Court against the award of fees for Delaware Valley's work before administrative agencies, contended that the work was not "judicial" in nature—as Pennsylvania argued work was required to be, to be eligible for fees under the Clean Air Act. *Id.* at 557-58; *see also* 42 U.S.C. § 7604(d) (courts may award "costs of litigation . . . to any party, whenever the court determines such award is appropriate"). Though the Court acknowledged that certain categories of work performed by Delaware Valley were not "judicial," it

23

nevertheless found the fees appropriate because Delaware Valley's non-judicial work had been "as necessary to the attainment of adequate relief for their client as . . . all of their earlier work in the courtroom which secured Delaware Valley's initial success in obtaining the consent decree." 478 U.S. at 558. Indeed, the Court pointed out that Delaware Valley's administrative-agency work, aimed at "[p]rotect[ing] . . . the full scope of relief afforded by the consent decree," was "*necessary* to enforce the remedy ordered by the District Court." *Id.* at 558-59 (emphasis added).

Significantly for our purposes here, the *Delaware Valley* Court noted the similarity between the fee-shifting provisions contained in (1) the Clean Air Act; and (2) 42 U.S.C. § 1988, applicable in this case, which provides for attorneys' fees in certain categories of civil rights litigation. *See id.* at 559-60. For example, both provisions are intended "to promote citizen enforcement of important federal policies." *Id.* at 560. The Court's discussion approvingly cited § 1988 cases in which courts had deemed fees for "postjudgment monitoring of a consent decree" appropriate even in contexts not resulting in additional court-ordered relief. *Id.* at 559. And in concluding that a reasonable fee award for Delaware Valley's work before administrative agencies was not precluded simply because it "did not

occur in the context of traditional judicial litigation," *id.* at 560, the Court noted that it perceived "no reason not to interpret" § 1988 and the fee-shifting provisions of the Clean Air Act "in the same manner."[6]  *Id.*

Despite *Delaware Valley*'s age, this Court has not before parsed the decision's rationale for awarding fees in the post-decree context.   We think the distillation of several principles—gleaned from our own case law and that of the Supreme Court—may help guide district courts as they consider attorneys' fees requests in this context going forward.   First and foremost, while we do not adopt the Seventh Circuit's strict requirement, set forth in *Alliance*, of additional court-ordered relief as a condition precedent to post-decree fees, a court assessing such fee requests should always consider the "results obtained."   *See Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999) (quoting *Hensley*, 461 U.S. at 434). While work need not necessarily result in a new court order to be eligible for fees,

---

[6]  The fee-shifting provision of IDEA, *see* 20 U.S.C. § 1415(i)(3)(B), is also construed with an eye to § 1988 and other similarly worded fee-shifting provisions.  *See J.C. ex rel. C. v. Reg'l Sch. Dist. 10, Bd. of Educ.*, 278 F.3d 119, 123-24 (2d Cir. 2002); *see also R.V ex rel. A.R. v. N.Y.C. Dep't of Educ.*, 407 F.3d 65, 73 n.9 (2d Cir. 2005).   Other circuits have applied the reasoning of *Delaware Valley* to fee-shifting provisions that, like § 1988 or IDEA, have a "prevailing party" requirement.  *See Keith v. Volpe*, 833 F.2d 850, 855-56 (9th Cir. 1987) (§ 1988); *Johnson*, 489 F.3d at 1102-03 (same); *Cody*, 304 F.3d at 772-73 (same); *see also Balla v. Idaho*, 677 F.3d 910, 917-918 (9th Cir. 2012) (Prison Litigation Reform Act).

it must nevertheless have effectively served to protect "the full scope of relief afforded by the consent decree." *Delaware Valley*, 478 U.S. at 558; *see also Johnson*, 489 F.3d at 1111 (noting that "though counsel's efforts may be compensable despite the absence of a court order, the effort must still be effective"). And of course, hours "dedicated to *severable* unsuccessful claims" should be excluded from any award calculation, *Quaratino*, 166 F.3d at 425 (emphasis added), even if they were originally undertaken "to enforce the remedy ordered by the District Court." *Delaware Valley*, 478 U.S. at 559; *see also Johnson*, 489 F.3d at 1111 (noting that "failed efforts could rarely justify attorney fees").

Second, a district court must consider fee requests with an eye to whether the work was "useful and of a type ordinarily necessary to secure the final result obtained from the litigation." *Delaware Valley*, 478 U.S. at 561 (internal quotation marks omitted); *see also Cody*, 304 F.3d at 773 (noting that "an earlier established prevailing party status extends to postjudgment work" that is a "'necessary adjunc[t] to the initial litigation'" (quoting *Jenkins ex rel. Jenkins v. Missouri*, 127 F.3d 709, 716 (8th Cir. 1997))). As the Tenth Circuit has helpfully explained, in the case of a consent decree directed toward systemic relief, this means work

26

"protecting the fruits of the decree," *not* simply any work "directed at the same problem" at which the decree was aimed:

> When a decree establishes a particular mechanism for addressing the problem that motivated the initial lawsuit, the "fruit of the decree" is a properly functioning mechanism, not the elimination of the problem addressed by the mechanism.

*Johnson*, 489 F.3d at 1108-09.  "In other words," as that Circuit put it, "the role of the plaintiffs' attorney in protecting the fruits of victory is to ensure that the decree is being honored, not to ensure that the problems motivating the decree have been eliminated."  *Id.* at 1109; *see also Quaratino*, 166 F.3d at 425 (stating that unsuccessful claims may be awarded fees, but only if "inextricably intertwined" with successful work (internal quotation marks omitted)).

Lastly, a district court must always ensure that hours spent on post-decree work are reasonable in degree.  *See Quaratino*, 166 F.3d at 425 (noting that district courts should "exclude excessive, redundant or otherwise unnecessary hours"); *see also Hensley*, 461 U.S. at 434 ("Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." (internal quotation marks omitted)); *Cody*, 304 F.3d at 773 ("Postjudgment litigation, like all work under the fee-shifting statutes, must be reasonable in

27

degree."). The more clearly a district court can set expectations at the outset of a decree regarding the amount and type of post-decree work that would be reasonable, the better. *See Keith v. Volpe*, 833 F.3d 850, 860 n.6 (9th Cir. 1987) (describing the district court's inability "to [otherwise] control, on a current basis, the amount of fees being incurred by one party at the expense of another," which may quickly lead to overbilling). When a district court is engaged in *post hoc* assessments of fee requests stretching back many years, it may face either (1) the "perplexing task" of rewarding—and hence encouraging in the future—overbilling, *id.*, or (2) the unenviable task of wiping out the only compensation an attorney could expect for years of work on a given case. The very best option, of course, would be a provision in the parties' agreement about what, and how much, post-decree work is compensable. *See Johnson*, 489 F.3d at 1109 ("[T]he amount of litigation on the subject suggests that explicit provisions in consent decrees would be a boon for all concerned (certainly the courts)."). But in the absence of such contractual specificity, district and magistrate judges are well advised to work with parties to avoid being forced to parse a large volume of requests at the end of the litigation process when the task could have been simpler if engaged with at some point earlier in the life of the decree.

28

As noted above, we review a district court's award of attorneys' fees under the statutes at issue here for abuse of discretion. *See Z.B.*, 336 F.3d at 80. District courts calculate fees pursuant to these provisions using the "lodestar" approach, "whereby an attorney fee award is derived by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *G.M. ex rel. R.F. v. New Britain Bd. of Educ.*, 173 F.3d 77, 84 (2d Cir. 1999) (internal quotation marks omitted). "There is . . . a 'strong presumption' that the lodestar figure represents a reasonable fee." *Quaratino*, 166 F.3d at 425 (quoting *Delaware Valley*, 478 U.S. at 565).

The Magistrate Judge's recommendation in this case, as accepted in part and altered in part by the district court, resulted in fees for the following categories of work: (1) negotiating the pre-settlement claim; (2) reviewing and responding to annual reports; (3) preparation for and attendance at EAP meetings; (4) class list and related motions; (5) communication; (6) motions for substantial noncompliance and an evidentiary hearing; (7) litigating attorneys' fees; and (8) empaneling the EAP. [7] *See* Def.-App. Br. at 57-58. Because Defendants-

---

[7] Defendants-Appellants note that Plaintiffs-Appellees did not cross-appeal, and thus the amount awarded by the district court is the largest amount they could receive.

Appellants make no argument before this Court as to Categories 5, 7, or 8, we do not address them. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998).

**Category 1.** The Magistrate Judge declined to award any additional fees for time spent before the Settlement Agreement was executed and accepted by the district court. The district court, however, concluded that 112.1 hours of work done between "June 8, 2001, when plaintiffs learned of the submission to the Legislature, [and] March 21, 2002, when the parties signed the agreement," was compensable. *See* S.A. 91. The court reasoned that "Defendants' unilateral action put the plaintiffs in the position of having to either accept a deal to which they had not agreed, or reopen[] negotiations." *Id.* Given that whether to award these particular fees "hinges on the interpretation of the Settlement Agreement" (and whether the Agreement encompasses all work done before its signing), we review the district court's conclusion as to this category of fees *de novo*. *Tourangeau v. Uniroyal, Inc.*, 101 F.3d 300, 308 (2d Cir. 1996).

---

*See Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*, 38 F.3d 1279, 1286 (2d Cir. 1994) ("[A]n appellee who has not cross-appealed . . . may not seek to enlarge its rights under the judgment by enlarging the amount of damages or scope of equitable relief."). While Plaintiffs-Appellees "may urge alternative grounds for affirmance," *id.*, they have provided this Court no alternative bases for fees if we determine that the district court abused its discretion in any part of its fee award.

We agree with the Magistrate Judge that "[a] plain reading of the Agreement demonstrates that the $675,000" referenced in the Settlement Agreement "encompasse[s] the attorneys' fees defendants agreed to pay and the plaintiffs agreed to accept for their work up to the date they signed the Agreement." S.A. 54. Although we decline to read the language "one-time payment" to preclude all *future* fees, this language does unambiguously provide that the parties intended $675,000 to be the exclusive payment for work done *prior* to the Settlement Agreement's execution. Plaintiffs-Appellees' contention that the $675,000 was compensation only for work done before November 28, 2000, is belied by the text of the Agreement, which contains no such temporal restriction. And even were we to consider the Side Letter probative of what the parties intended regarding fees, the Magistrate Judge correctly concluded that the letter and surrounding negotiations were "concerned *not* about [Plaintiffs'] fees during this period up to the signing of the Settlement Agreement, but about their ability to recover fees *incurred in the future* related to enforcement activity." *Id.* at 54 n.17 (internal quotation marks omitted) (emphases added). We therefore vacate the district court's award of 112.1 hours associated with Plaintiffs-Appellees' pre-settlement claim.

**Category 2.** However, we see no abuse of discretion in the district court's decision to award 105.7 hours for reviewing and responding to Defendants-Appellants' annual reports. Defendants-Appellants argue that because there was a provision in the Agreement requiring the EAP to review the annual reports and submit comments, but no such provision requiring Plaintiffs-Appellees to do so, the district court's award for that work "effectively rewrite[s]" the Settlement Agreement. *See* Def.-App. Br. at 67. But while it is true that the Settlement Agreement did not specifically *require* Plaintiffs-Appellees to review or provide comments on the reports, the Agreement clearly anticipated that Plaintiffs-Appellees would receive these reports and the EAP's evaluation of them. *See* J.A. 158 (Settlement Agreement) (providing that Defendants-Appellants would furnish Plaintiffs-Appellees with the annual report and that the EAP would give them its comments). In *Delaware Valley*, the Supreme Court approved a fee award without regard to whether the compensated work was contemplated in the consent decree; instead, the Court assessed only whether the work "[p]rotect[ed] . . . the full scope of relief afforded by the consent decree." 478 U.S. at 558; *see also id.* (approving request for work related to commenting on regulations that was "as necessary to the attainment of adequate relief for their

client as was all of their earlier work"). Here, therefore, we conclude—as the *Delaware Valley* Court did—that the district court committed no clear error in determining that Plaintiffs-Appellees' responses to the annual reports meaningfully contributed to enforcing the remedy that Plaintiffs-Appellees obtained through the Settlement Agreement by "identif[ying] plaintiffs' concerns with defendants' performance so that issues could be discussed and resolved through the EAP." S.A. 61. Our conclusion is bolstered by an affidavit from an EAP member that described Plaintiffs-Appellees' work on the report responses as "contribut[ing] significantly to the remedial process." J.A. 1557 (Sailor Affidavit).

**Category 3.** Nor did the district court abuse its discretion in awarding 200.8 hours for Plaintiffs-Appellees' attorneys' time spent preparing for and attending the EAP meetings. The magistrate awarded 229.4 hours for time spent on this work, which was a 20% reduction from the amount requested for preparing and attending the meetings as well as a 50% reduction to all time described as travel time. The magistrate's recommended award for preparation and attendance was further reduced by the district judge by 28.6 hours. Defendants-Appellants again argue that the district court impermissibly expanded upon the

33

parties' bargain, as there was no role for attorneys at the EAP meetings and the Settlement Agreement did not contemplate them being there. We again disagree.

As with the time spent responding to reports, just because the Settlement Agreement did not expressly provide for attorneys' attendance at the meetings, that does not mean their work was not of the sort "ordinarily necessary" to secure the Agreement's result. *See Delaware Valley*, 478 U.S. at 561 (internal quotation marks omitted). According to the Agreement, the EAP meetings were about "[f]acilitat[ing] the defendant's compliance with [the] Agreement, identifying difficulties in compliance, facilitating resolution of compliance issues without court intervention, and referring to the court issues that cannot be resolved by discussion and negotiation." J.A. 158 (Settlement Agreement). It is perfectly logical that attorneys' attendance at these meetings would be useful in securing full enforcement of the Settlement Agreement. *See id.* at 1557-58 (Sailor Affidavit) ("Plaintiffs' counsels' participation was also instrumental in resolving issues that otherwise would have had to be submitted to the Court for resolution."). To the extent Defendants-Appellants take issue with the district court's decision to award fees for *two* attorneys' work in this category, that decision was well within the court's discretion. *See N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d

34

1136, 1146 (2d Cir. 1983) (suggesting the district court is best situated to decide when an extra lawyer may be helpful "on the basis of its own assessment of what is appropriate for the scope and complexity of the particular litigation").

**Category 4.**   The district court awarded fees for 57.2 hours spent obtaining information about the class list, which is a 20% reduction from the amount requested.   *See* S.A. 64-67.   The court reasoned that such information "was helpful to plaintiffs' efforts to monitor compliance with the Settlement Agreement."   *Id.* at 66.   We agree with the district court's conclusion in part.

One item in contention in the parties' negotiations over the list was the provision of personally identifiable information on students in the class, which Plaintiffs-Appellees wanted.   While Defendants-Appellants did not believe they were required by the Agreement to provide such information, they offered to send opt-out notifications to class members under the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, so that the information could then be released from consenting families, in compliance with the law.   Instead of agreeing to Defendants-Appellants' offer, Plaintiffs-Appellees filed a motion in January 2005 to enforce the Settlement Agreement, arguing that Defendants-Appellants had failed "to provide and update a list of class members" as required

by the Agreement. S.A. 66 (internal quotation marks omitted). But before the motion could be ruled on, the parties agreed to Defendants-Appellants' original plan to send FERPA notifications and create a list based on those responses.

The Settlement Agreement plainly contemplates Plaintiffs-Appellees' access to class data to allow them to monitor Defendants-Appellants' progress. *See* J.A. 149 (Settlement Agreement) (requiring that Defendants-Appellants provide Plaintiffs-Appellees with an updated class list and giving Plaintiffs-Appellees the right to challenge that list as inadequate). In the absence of a data set that allowed Plaintiffs-Appellees to track students across the years, it would be practically impossible for them to track Defendants-Appellants' progress on the Agreement's goals or to understand any potential reclassification issues. Thus, we agree with the district court that negotiations with Defendants-Appellants over the class list fell well within what was "useful" or "of the type ordinarily necessary" to secure enforcement of the Settlement Agreement. *See Delaware Valley*, 478 U.S. at 561 (internal quotation marks omitted).

However, the court went beyond the scope of *Delaware Valley* and *Quaratino* when it awarded time for Plaintiffs-Appellees' *unsuccessful* motion to enforce. The hours Plaintiffs-Appellees spent on the motion to enforce could have been

avoided if they had accepted Defendants-Appellants' initial offer. We therefore vacate the award of 57.2 hours insofar as it includes hours related to the motion to enforce. *See Quaratino*, 166 F.3d at 425 ("[T]he district court should exclude . . . unnecessary hours . . . ."). On remand, we direct the district court to disallow all fees relating to Plaintiffs-Appellees' January 2005 motion to enforce. Nonetheless, the district court in its discretion may award fees for pre-motion class list negotiations, as well as activities it considers to have been helpful in *implementing* the FERPA-compliant notification system as originally proposed by Defendants-Appellants and ultimately agreed to by the parties in March 2005.

**Category 6.** Lastly, while the Magistrate Judge declined to award any fees for work on the unsuccessful motions for substantial noncompliance and the associated evidentiary hearing, concluding such work did not fall within the *Delaware Valley* standard, the district court awarded 240 hours (approximately 28% of what Plaintiffs-Appellees requested for this category of work), determining that the request for an evidentiary hearing was "reasonably necessary to protect the rights of the class members." S.A. 91. As noted above, unsuccessful work normally does not merit a fee award; however, unsuccessful work that is "inextricably intertwined" with successful work may be compensable. *See*

*Quaratino*, 166 F.3d at 425 (internal quotation marks omitted). Plaintiffs-Appellees argue that the evidentiary hearing was useful because it resulted in the creation of another report describing Defendants-Appellants' progress on the Agreement's goals based on an analysis of the longitudinal database. However, by the time Plaintiffs-Appellees received this new report, the court had already been divested of jurisdiction over the Settlement Agreement, except with regard to motions for substantial noncompliance. Thus, to the extent that receipt of this new data and report was "useful and of the type ordinarily necessary" to enforce the Settlement Agreement, that could be true only in the context of a successful motion for substantial noncompliance. As Plaintiffs-Appellees *lost* their motion, we see no reason to consider the production of the data "useful or necessary." We decline to reward data collection for the sake of data collection.

For that reason, we conclude that awarding any fees for work related to this motion was an abuse of discretion. We therefore vacate the 240 hours awarded by the district court for Plaintiffs-Appellees' motion for substantial noncompliance and the associated evidentiary hearing.

## CONCLUSION

For the foregoing reasons, we AFFIRM in part and VACATE in part the district court's September 30, 2017 order awarding $470,727.57 in attorneys' fees and costs.   We REMAND the case to the district court for further proceedings consistent with this opinion.